# Richmond

SALLIE B. TEMPLE AND OTHERS, ADMINISTRATORS V.
JOHN A. MOSES.

April 8, 1940.

Record No. 2178.

Present, All the Justices.

The opinion states the case.

*L. J. Hammack, A. S. Harrison, Jr.,* and *B. A. Lewis,* for the plaintiffs in error.

*Langhorne Jones, E. P. Barrow* and *Joseph Whitehead, Jr.,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Sallie B. Temple, William J. Temple and Roy R. Temple, administrators of the estate of John R. Temple, deceased, instituted this proceeding against John A. Moses to recover damages for injuries resulting in the death of their intestate, received in a collision between an automobile owned and operated by John R. Temple and an automobile owned and operated by John A. Moses.

The defendant filed a plea of contributory negligence, a plea of not guilty and a counterclaim for his personal injuries. A special jury of twelve men returned a verdict for $10,000 in favor of Moses on his counterclaim. Their verdict was approved by the trial judge and judgment entered thereon.

The plaintiffs assign error to the refusal and granting of certain instructions by the trial court, the admission of certain evidence, and the refusal of the trial court to grant a new trial upon the ground of the incompetency of a juror and to set aside the verdict as contrary to the law and the evidence.

It is admitted that the verdict settled all conflicts in the evidence in favor of the defendant. It will, therefore, be necessary only to set out so much of the evidence as is most favorable to the defendant, and such as may be required to consider the defendant's assignments of error.

The collision occurred about eleven a. m., on June 11, 1938, on the heavily traveled primary State Highway No. 58, at a point on said highway where a private road or lane from a farm owned by the plaintiffs' intestate intersects

the State Highway at approximately a right angle. The day was bright and clear and the roadways were dry. The farm, known as the "Reps Jones Farm," is four miles west of Lawrenceville, Virginia. Route 58 is an improved road, with a tar surface of 21 feet and a ditch-to-ditch width of 36 feet. At the point of the collision, Highway 58 runs east and west, and is straight for approximately one mile to the east and 500 feet to the west of the intersection. Beyond 500 feet to the west, the view eastwardly along the highway is obstructed by a knoll, which is 7.9 feet higher than the road at the point of the intersection. The farm lies to the south of Route 58, and the farmhouse, as shown by the exhibits, is on rising ground surrounded by a grove of trees. The distance from the house to the highway is estimated at from 500 yards to one-half a mile. The land adjacent to the road is cleared and, on the day of the accident, was covered with a stand of wheat approximately three feet high. That portion of the private road which lies within 300 feet of the intersection is below the level of the highway. Its grade is not uniform, there being a grade of more than 10% in the 50 feet adjacent to the highway, with the grade rising or falling as it extends from the highway, according to the contour of the farmland. The used portion of the lane is 11 feet wide; but it has a width of 21 feet from ditch line to ditch line. At its intersection with the highway it flares out and takes the form of a "Y," having a width of about 20 feet.

There are conflicts in the evidence as to whether a truck coming out of the lane could have been seen above the stand of wheat by a person driving a passenger car eastwardly on Route 58 from the knoll, hereinbefore mentioned, to the intersection, and whether such a passenger car could have been seen by a person coming out of the lane in a truck.

On the morning of the accident, Temple, a man seventy-five years of age, had visited his farm and, having completed his business, left the farm driving his International pick-up truck. He traveled north on the farm lane as he

approached Route 58 and entered Route 58, turning his truck westward or to the left.

John A. Moses, who was 36 years of age, was driving a two-door 1937 Model Ford sedan eastwardly along the state highway. The left front of the sedan struck the left side of the truck at or a little ahead of the door of the cab. The truck was pushed back downgrade a distance of 47 feet. It turned over on its side on the north of the road and laid partly in the ditch. The front of the passenger car was badly damaged. It stopped facing the east about 6 or 8 feet from the disabled truck. Temple and the wife of the defendant were killed, and the defendant was gravely and seriously injured. The five other passengers in Moses' car suffered injuries of a more or less serious nature.

Moses, accompanied by his wife, daughter, three other women and a child, was on his way to Norfolk. His wife and his daughter, 15 years old, were on the front seat with him, and the three women passengers were on the rear seat, the child, 6 years old, sitting on the lap of one of them.

Moses had driven from Chatham to the place of collision, a distance of about 90 miles, in approximately three hours driving time. He and three of his passengers testified that he had consistently driven at a speed of from 40 to 45 miles an hour, because two of the passengers had requested, before starting the trip, that he drive slowly, since they were of a nervous temperament. Several witnesses who saw a car similar to that of Moses on the highway shortly before the collision estimated the speed of the car they saw at from 60 to 75 miles an hour; but were unable to identify the car as that of Moses.

Moses gave the following version of the collision:

"Q. When did you first see the Temple car?

"A. When it popped right out in front of me.

"Q. Then what did you do?

"A. I immediately applied my brake, slapped my hand on the horn button, and veered my car to the left; all in one motion. I saw the car pop out and I realized I was facing an emergency, and I put my foot on the brake, and slapped

my hand on the horn button, and veered to the left, all in one motion, quicker than it takes me to tell it.

"Q. When you say it popped in the road, as you express it, in front of you?

"A. That is right.

"Q. Would you try to estimate how far you were from the accident when you saw the car?

"A. I would not attempt to estimate correctly. I would say, off hand, about the distance from here to the back wall.

"Q. Had you any previous knowledge that the automobile was approaching the road?

"A. None whatever.

"Q. Now, what happened after you had done that, do you know?

"A. After I applied the brakes?

"Q. Yes.

"A. By the time I did that, I cracked into him. I hardly got the brakes on."

The record does not show the distance in the court room from the witness stand to the back wall, estimated by Moses as the distance from which he first saw the Temple car. In the briefs, plaintiffs contend the distance was 30 feet and the defendants that it was 37 feet.

Moses further said that he had his car under thorough control; that he struck the Temple truck broadside and near the center; that he estimated it was traveling between 20 and 25 miles an hour; and that, at the time it was hit, it was wholly on the hard surface of the highway.

Mrs. Lucy A. Dix, a passenger in Moses' car, gave the following testimony: "I heard Mr. Moses blow and I raised right up when I heard him blow. I see the car come into the road. It seemed like it was going to place itself right in front of us, * * * I said, 'Lord have mercy upon us all,' and folded my hands like that. That is all the time I had, and by that time we were into the crash." She also added that she had just been looking at the speedometer and it registered 40 miles per hour.

Mrs. Sophie Brewer, the wife of the tenant of Mr. Temple on the Reps Jones Farm, testified that on the day in question she was in her kitchen in the farmhouse, engaged in washing string beans to cook and was putting them from one pan into another; that from a window in the front of her kitchen facing the highway she saw Mr. Temple as he drove from the farmhouse down the private road to the highway; that he slowed down, but made no stop before he went into the highway; that when the front part of Temple's truck was on the highway the other car "running right fast" was up the road between two specific telephone poles; that she could see the whole side of the truck when it was hit; that her observation was purely from a casual glance, because she just happened to look up when she saw the cars; and that it did not occur to her a collision was about to take place.

Other evidence indicates that the distance from the point between the telephone poles to the intersection of the private road with the highway is 280 feet.

The truck had a length of 14 feet 1½ inches, and a width between its front wheels of 5 feet 1 inch. It was found to be in second gear after the accident.

There was also evidence that Temple had, on the morning of the accident, complained of rheumatism and had said that it was difficult for him to turn his head.

On the main highway there were markings leading from a scooped out place in the road, supposedly the point of impact, to the car and to the truck. The scooped out place in the road was 4 feet 8 inches from the north side of the hard surface and 19 feet 6 inches from the center of the intersection and was allegedly made by the brake drum of the passenger car. There were tire marks extending westwardly back from the point of impact for 39 feet, supposedly made by the sedan.

After a witness had testified that a 1937 Model Ford V-8, with brakes properly adjusted, traveling at a rate of 40 to 45 miles per hour, could be stopped within a distance of 50 feet, a State highway traffic officer, over the objection of

the plaintiffs, was permitted to testify, from a chart relating to the braking distance of motor vehicles at certain rates of speed. This chart, prepared for the inspection service by the Division of Motor Vehicles of Virginia, specified, among other things, the distance within which brakes are required to stop a car on a dry, hard, level surface, free from loose material, in order to meet the legal requirement of such inspection. Virginia Code 1936, section 2154 (146). The lawful stopping distance, when traveling at a speed of 40 miles per hour, on a car similar to the defendant's, with four-wheel brakes, was fixed at not more than 100 feet, and when traveling at 45 miles an hour, not more than 126 feet. These requirements applied only to the actual braking time. They made no allowance for time consumed in the reaction of the operator before applying the brakes.*

In addition to the evidence, the jury was sent to the scene of the accident, and visited and examined both the roadways and the farmhouse.

 It is clear that there is sufficient evidence to support the verdict of the jury. It only remains to be considered whether there was any error in the rulings of the trial court upon the instructions, admission of evidence and the competency of a juror.

Eleven instructions were given to the jury, the first seven at the request of the plaintiffs and the other four at the request of the defendant.

The plaintiffs' instructions covered the duty of a driver of an automobile upon the highway and told the jury that in determining whether or not the defendant was guilty of negligence they might consider the speed of his car and the physical facts of the collision, as shown by the condition of the cars and the markings on the road. They further stated that in order to justify Moses in driving to the left of the center of the highway, at the time of the collision, the evidence must show that, in fact, there was a sudden emergency confronting him, not created by his fault. They

*Stratton v. Bergman, 169 Va. 249, 254, 192 S. E. 813, 815.

informed the jury as to the purpose of the view of the premises and explained "proximate cause."

The defendant's instructions advised the jury as to the law governing the conduct of one placed in a sudden emergency, and as to the duty of a driver of a vehicle entering a public highway from a private road to come to a stop immediately before entering such highway and, upon entering the highway, to yield the right-of-way to a vehicle approaching thereon.

■ Refused instruction number 1-R telling the jury that the driver of an automobile shall drive his car upon the right half of the highway upon which he is approaching was covered by a given instruction.

Refused instruction 2-R sought to tell the jury that, in determining whether Temple was negligent in entering the highway, the test was whether or not he used the care which a reasonably careful and prudent man would have used under the circumstances, and that Temple had the right to presume that the defendant was operating his car at a careful and prudent speed.

■ The law requires not only that a driver use reasonable care in entering a public highway from a private road, but, in the exercise thereof, that he shall come to a complete stop immediately before such entering. Virginia Code 1936, section 2154, subsection 124, reads as follows:

"The driver of a vehicle entering a public highway from a private road or driveway shall, immediately before entering such highway, stop, and upon entering such highway shall yield the right of way to all vehicles approaching on such public highway."

■ Temple could not excuse the violation of his statutory duty by relying upon a presumption that a car operated upon the highway was being driven at a careful and prudent speed. The law requires such stop, and common sense, reasonable caution and prudence dictate that the driver of the stopped vehicle, before entering the main artery of travel, shall look, and not enter into the public highway without seeing that such movement can be made with safety.

He is under a duty to see what is in plain sight. The duty of Temple upon entering the highway was correctly and amply stated in the given instructions.

Assignment number 3 relates to the refusal to grant plaintiffs' instruction on the last clear chance. This type of instruction offers an often abused principle of law. Plaintiffs contend that it should have been granted on the evidence of Moses that he was driving his car at only 40 to 45 miles per hour and on the evidence of Mrs. Brewer as to the distance she saw his car from the intersection as Temple entered the highway. Whatever Mrs. Brewer saw of the approaching sedan, half a mile distant, was only by a casual glance through her window and across a field of wheat, while she was preoccupied with her household duties. She does not undertake to say how far the Moses' car was from the truck when it became apparent, or should have become apparent, to Moses that Temple was entering the highway and was not going to stop. Her statement makes no allowance for the time required by Moses to grasp the situation and for the reaction thereto. Physical circumstances, the location of the principal force of the blow against the truck, the extent of the damage inflicted by that blow and the location of the truck on the highway after the collision tend to show that it was struck almost fully broadside. These physical facts and the proximity of the point of impact to the intersection evidence the further fact that the sedan was dangerously near the intersection, if it was traveling at 40 to 45 miles per hour when the truck entered upon the public highway.

The burden was on the plaintiffs to affirmatively show that Moses, by the use of ordinary care, after he saw, or should have seen Temple, had, in fact, a last clear chance to avoid the collision. There must have been time for effective action. A mere possibility is not sufficient. Speculation cannot take the place of positive evidence. *Hutcheson* v. *Misenheimer*, 169 Va. 511, 194 S. E. 665; *Green* v. *Ruffin*, 141 Va. 628, 125 S. E. 742, 127 S. E. 486. (See

*Virginia Stage Lines, Inc.* v. *Lesny, post,* page 351, 8 S. E. (2d) 259, this day decided, and cases therein cited).

When we consider the evidence and apply the rules governing the doctrine of the last clear chance, it is manifest that the refused instruction should not have been granted.

Instruction number 4-R was properly refused because there was positive evidence that Temple did not bring his vehicle to a stop immediately before entering the highway.

Instruction number 8, the first instruction granted the defendant, told the jury that the driver on the main highway has the right "to assume" that the driver of another vehicle approaching or entering the highway from a side road will stop and will not enter or start into the highway without first seeing that such movement could be made with safety, and that if Temple "failed to stop and saw or by the use of reasonable diligence could have seen the oncoming automobile of John A. Moses and failed in these respects, then he is guilty of negligence and cannot recover," even though Moses was negligent.

Plaintiffs objected to this instruction on the ground that it told the jury Moses had a right "to assume" that a person approaching the highway would stop before entering the same, because Moses had testified that the decedent was actually entering the road when first observed by him. The objection is without merit. The fact that Moses did not see Temple before the latter entered the public highway did not relieve Temple of his duty to observe the mandatory requirement of the statute that he stop; but, whether Temple stopped or not, he could not relieve himself of the duty to look out for and to observe approaching traffic on the public highway. As was said in *Otey* v. *Blessing,* 170 Va. 542, 197 S. E. 409, by Mr. Justice Holt, "To stop and not to look is inexcusable and inexplicable." It is equally culpable under such circumstances to proceed without looking.

The instruction sets out the doctrine of contributory negligence. Instruction number 10, given without objec-

tion from the plaintiffs, covers more completely the same proposition.

A careful reading of all the instructions assures us that the jury was properly and fully instructed on all issues before it and in accordance with the evidence.

█ Another assignment of error is based upon the admission of the testimony of a State highway traffic officer who testified from a chart prepared by the Division of Motor Vehicles of Virginia as to the distance within which an automobile of the same type as the one driven by Moses could be stopped at certain speeds and under certain conditions. This chart prescribed that automobiles, on their semi-annual inspection, shall be so equipped as to stop within the distances therein stated. It was not particularly pertinent in this case because it did not prescribe a test under conditions similar to the one under which this accident occurred; but applied only to the inspection service for the purpose of determining whether or not a car was properly equipped with brakes. While the evidence was not especially informative, its admission was at least harmless.

The plaintiffs finally contend that the trial court erred in refusing to grant a new trial on the ground that C. M. Cross, a juror, was incompetent. After the trial, O. M. Wilson, a disinterested party and a reputable citizen, made an affidavit that Cross had, before the trial, while riding in an automobile with him, pointed out to him the place where the accident occurred and expressed a definite opinion that Temple was at fault. Wilson did not know until after the trial that Cross had served as a juror. He did not offer the information to the plaintiffs, but casually told one of his friends, who, in turn, told counsel for the plaintiffs. Counsel for the plaintiffs then saw Wilson and secured the affidavit. Wilson, who remained on friendly terms with Cross, told Cross the circumstances under which he had made the affidavit. Cross, in an affidavit made about twelve days after Wilson's affidavit, admitted being with Wilson and discussing another accident in which a son of Cross was involved. He stated that he did not recall speaking of the

Temple accident; but did not deny it, saying that he considered Wilson a truthful man. When Cross appeared as a witness on the motion for a new trial, he absolutely denied making any statement that Temple was wholly at fault for the collision, or that he intended to refer to that collision. He stated most positively that he had not read the contents of Wilson's affidavit at the time he made his affidavit. He said that when he qualified and served as a juror he had a perfectly open mind about the whole matter, ready to hear the evidence and instructions of the court and to render a fair and impartial decision according to the law and the evidence; and that he had no prior information as to how the accident occurred upon which he could make any statement or form any opinion as to who was to blame for the collision. Wilson and a number of others testified that Cross was a man of good character and reputation.

There have been numerous cases in Virginia involving a motion for a new trial because of a juror's alleged disqualification. *McCue* v. *Com.*, 103 Va. 870, 49 S. E. 623; *Robinson* v. *Com.*, 104 Va. 888, 52 S. E. 690; *Pitchford* v. *Com.*, 135 Va. 654, 115 S. E. 707; *Parsons* v. *Com.*, 138 Va. 764, 121 S. E. 68; *Ballard* v. *Com.*, 156 Va. 980, 159 S. E. 222; *Cox* v. *Com.*, 157 Va. 900, 162 S. E. 178; *Winn* v. *Com.*, 160 Va. 918, 168 S. E. 351; *Compton* v. *Com.*, 163 Va. 999, 175 S. E. 879; *Bausell* v. *Com.*, 165 Va. 669, 181 S. E. 453; *Abdell* v. *Com.*, 173 Va. 458, 2 S. E. (2d) 293.

In the following four of these cases the challenged juror or jurors were held to be disquaified.

In *Pitchford's Case, supra,* a juror, although he stated on his *voir dire* that he had not formed or expressed an opinion and could give an accused a fair trial, was held not to be an impartial juror, because he admitted that he had formerly made statements that the accused ought to be punished, statements which nullified his testimony on his *voir dire.*

In *Parsons' Case, supra,* the questions asked the juror for the purpose of establishing his impartiality were held to be leading and persuasive, and the juror declared incompetent because of an opinion which he had formed before the trial

and which he stated he would retain until new evidence was presented.

In *Winn's Case, supra,* the juror was held to be partial and prejudiced where he had formed a fixed opinion against an accused on one of the counts in an indictment.

In *Bausell's Case, supra,* it was held that two jurors, who, under persuasive and prejudicial questioning, said they could disregard previously formed opinions, were not qualified.

In the other cases above, the qualification of the jurors involved was upheld.

■ While the cited cases are criminal cases, the right to a fair and impartial trial in a civil case is as fundamental as it is in a criminal case. The civil courts constantly strive to protect this right. It lies at the very basis of organized society and confidence in our judicial system.

■ In recent years, the trend of modern decision has been to limit rather than to extend the disqualification of jurors by reason of mere opinion. The character of the juror's opinion is carefully scrutinized by the courts. If the juror has beforehand formed a decided, substantial or fixed opinion as to the guilt or innocence of one of the parties, no matter upon what ground it was formed, he is incompetent; but if his opinion is based upon some information which he has read in a newspaper or which has come to him from some other source and is merely hypothetical, conditional or qualified, and the court is satisfied from an examination of the prospective juror, on his *voir dire* or otherwise, that he can render a fair and impartial decision according to the law and the evidence, without bias or prejudice, he is not disqualified. *Abdell* v. *Com., supra.*

■ It is not possible to apply definite rules to serve as a test in all cases as to the competency of jurors, and each case must be determined under its own facts and circumstances. We must necessarily give great weight to the judgment of the trial judge. As Mr. Justice Holt said in *Ballard* v. *Com., supra* [156 Va. 980, 159 S. E. 229], "He,

better than anyone else, can gauge their candor and their purpose to give fair judgment on the evidence."

In *Cox* v. *Com.*, *supra*, Mr. Justice Hudgins, after reviewing a number of former cases involving this question, said [157 Va. 900, 162 S. E. 183]:

"A motion for a new trial after the verdict, on the ground of the disqualification of a juror, is addressed to the sound discretion of the trial judge, and where there is a conflict of testimony as to the language and conduct of the juror on which exception is founded, it is his duty to weigh and decide upon the credibility of the opposing statements of the witnesses and juror, and to determine whether in justice to the accused, and upon all the circumstances of the case, a new trial ought to be awarded."

In the case before us, the facts affecting the competency of the juror may be readily distinguished from the facts in each of the above cases where it was held that a juror was incompetent. Here Cross not only said that he did not recall the statements attributed to him, but denied that he had made them. While he made no denial in his affidavit, he did therein say that he had no recollection of making the statements. He testified on his *voir dire* that he had no information upon which to base such statements or to form an opinion. Without entering into the possibility of confusion as to whether he intended a reference to a different person, if he made the statements, if Cross went into the jury box with no recollection of having made such statements, or having formed the opinion they represented, he, at that time, had an open mind. If he made such statements and did not remember them, they could not have been expressions of a fixed or unqualified opinion.

The discretion of the able, learned and experienced trial judge exercised upon such motions will not be interfered with upon review by this court, unless some injustice has been done. *Allen* v. *Com.*, 122 Va. 834, 94 S. E. 783. The record shows that he exercised his discretion with the utmost care. It does not appear to us that he abused his

discretion in this respect, or that the plaintiffs suffered any injustice by reason of the service of the juror, Cross.

█ This case comes to us as made out in the trial court. We must consider it on the evidence there given and the issues there raised. We sit as an appellate court for a review of such evidence and issues, not as a trial court.

█ It is apparent from the record before us that the jury could have found that Temple either entered upon the public highway from a private road without stopping before entering it, or, if he stopped, that he failed to keep a proper lookout and to give Moses the right of way, or that he failed both to stop and to look. A failure of his duty in either respect, under the circumstances, constituted negligence of a grave character. He did drive out in front of a car, dangerously near the intersection, which he could have seen had he looked. This view of the case was taken by a special jury of twelve men who had the benefit of seeing and hearing the witnesses testify and who viewed the premises and surrounding grounds. To it is added the weight and approval of the trial judge. Since there is ample evidence to support their judgment, and we can find no reversible error in the record, that judgment is affirmed.

*Affirmed.*