# Richmond

ELIZABETH E. SIEGFRIED V. CITY OF CHARLOTTESVILLE.

June 14, 1965.

Record No. 5942.

Present, Spratley, Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*William A. Perkins, Jr. (Jack N. Kegley; Battle, Neal, Harris, Minor & Williams*, on brief), for the appellant.

*Paul D. Summers, Jr., City Attorney* and *C. Armonde Paxson (Paxson, Marshall & Smith*, on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

Elizabeth E. Siegfried, defendant, appealed from a final order entered January 10, 1964 in a condemnation proceeding instituted against her by the city of Charlottesville.

The record discloses that on November 8, 1962, the city of Charlottesville, hereinafter referred to as the city, filed a petition to ac-

quire by condemnation the fee simple title to a triangular parcel of land located on the east side of U. S. Route 29 (Emmet Street) containing approximately 14,636 square feet together with a permanent drainage easement and a temporary construction easement. A certificate of deposit in the amount of $12,717 had previously been filed by the city.

The petition stated, among other things, that the land in question was owned by Elizabeth E. Siegfried and that a *bona fide*, but ineffectual effort to acquire the property from her by purchase had been made. Mrs. Siegfried filed an answer to the petition admitting that an offer had been made but denying that it was *bona fide* within the meaning of law. She alleged, *inter alia*, that the value of the land to be taken was $200,000 and that the damage to the residue was $200,000. On May 13, 1963 an order was entered overruling that part of Mrs. Siegfried's answer which alleged that no *bona fide* offer had been made and holding that a *bona fide* offer had been made. On the same day another order was entered summoning certain disinterested freeholders to meet on May 21 for the purpose of trying the issue of just compensation.

On May 20, the day before the freeholders were to meet, a news article concerning the condemnation of Mrs. Siegfried's land appeared in "The Daily Progress", an evening newspaper of general circulation in the Charlottesville area. The article was written by Ruth Lane, a reporter for the newspaper, and its headlines stated in prominent type:

"*City Offers $12,717*
"OWNER ASKS $400,000
FOR EMMET STREET LAND"
The body of the article read as follows:

"A special Corporation Court board of commissioners will hear argument tomorrow in an Emmet Street condemnation case involving a $12,717 city offer for the land and the owner's requested settlement of $400,000.

"Mrs. Elizabeth C. (sic) Siegfried of Hollywood, Fla., seeks $200,000 for the land and another $200,000 for damages to the residue of the parcel affected by the 1.2-mile dual-lane highway now under construction.

"The condemnation suit is the second of three such proceedings to acquire land for the $600,000 project. Two dozen parcels were purchased without condemnation proceedings.

"In December a board of commissioners awarded the Gulf Oil Co. nearly $20,000 in damages to a service station at Emmet Street (U.S. 29) and Barracks Road, and set the purchase price at $7,600 for the 2,170 square feet taken by the city.

"The parcel owned by Mrs. Siegfried contains 32,000 square feet, of which the city is taking 14,636 square feet—a long, narrow triangle with an 840-foot frontage across from the Thomas Jefferson Inn.

"The hearing tomorrow will open at 10 a.m. in the Council chambers in City Hall.

"Corporation Court Judge George M. Coles has named 10 'disinterested freeholders,' from whom the five-man board of commissioners will be appointed.

"Those summonsed to appear are: * * *

"City Attorney Paul D. Summers Jr. will represent the city at the hearing. Jack N. Kegley is attorney for Mrs. Siegfried and for Mrs. Virginia Earhart, the landowner in the third condemnation case, which involves only an easement and is not yet scheduled for hearing.

"Construction of the new highway—between the C & O Railroad underpass north to the junction with the U.S. 250 bypass—was started last fall. Under a new charter amendment the city was allowed to proceed with work during condemnation actions to complete land acquisition.

"The city-share of $150,000 for the project was voted in a 1961 referendum. State and federal funds make up the total."

Also on May 20, two news stories which contained similar information concerning the condemnation of Mrs. Siegfried's property were each broadcast twice over WINA, a Charlottesville radio station, by Wayne Harris, news editor for the station. The record shows that on Friday, May 17, three days before the news story was published and the radio broadcasts were made, Harris called at the office of Paul D. Summers, Jr., city attorney, on his usual daily round seeking city legal news for his radio station. He visited with Summers for a few minutes and was preparing to leave when Summers noticed certain papers on his desk pertaining to the Siegfried case and told Harris "that the case would be coming up on Tuesday."

Harris was aware of the case and thus "had a little background information". He asked Summers several questions concerning the Emmet Street project and during the conversation, Ruth Lane, a reporter for "The Daily Progress", telephoned Summers and in-

quired about city legal news. Summers also informed her about the Siegfried case "since I had told WINA and try to give both radio and press the same news information." Summers told Miss Lane the extent of the city's taking, and Harris, who was still in the office, wrote the information down. Miss Lane asked Summers if any of the suit papers were available in the clerk's office and when he said "yes" she "hung up".

Harris then asked Summers if copies of the suit papers were available so that he would not have to go to the clerk's office, and Summers showed him his file copies. Harris "asked how much the City had offered Mrs. Siegfried and he [Summers] said he would rather not say how much Mrs. Siegfried had been offered, but should refer to it as a certificate of deposit which was what the Council estimated to be the fair market value of the land and was a matter of public record and that the certificate of deposit was for $12,-717.00."

On Monday, May 20, Ruth Lane visited Summers on her "usual news beat" and asked him what he was working on. He told her that "he was working on the Siegfried condemnation case", and in response to a question he informed her that the case would be tried the next day.

Miss Lane then went to the clerk's office to obtain the names of the "commissioners" and while there she decided to read all of the papers filed in the suit. She did not recall seeing the word "offer" used in any of the papers, but she did ascertain that the sum of $12,717 had been deposited by the city for the land and surmised that the same amount had been offered. Miss Lane also obtained from the papers on file the figure of $400,000 which Mrs. Siegfried was asking for the land taken and for damages to the residue.

On May 21, the day of the hearing, the court examined upon their *voir dire* nine freeholders who had been summoned. After propounding certain questions relating to their qualifications to be appointed commissioners the court asked whether they had read the newspaper article[1] published the night before concerning the trial. "All the freeholders replied in the affirmative. The Court then explained that they must, in order to serve as commissioners, be able to swear that they would not be biased or prejudiced in any way by the newspaper article and must be able to make their award based on

---

[1] The record does not show that the freeholders summoned were asked by the court whether they had heard the radio broadcasts or that any of them had in fact heard such broadcasts.

their view, the evidence that would be presented and the instructions of the Court. The Court then asked whether any freeholder felt that he was biased or prejudiced against either the City or the Defendant [Mrs. Siegfried] by the newspaper article. None of the freeholders replied in the affirmative."

Counsel for the parties then took their peremptory challenges, and the court inquired again of the five remaining freeholders whether they could give a fair and unbiased award to Mrs. Siegfried based upon their view, the evidence which they would hear, and the instructions to be given. They replied in the affirmative, and the court entered an order appointing them as commissioners.

After the commissioners were duly sworn, counsel for Mrs. Siegfried, out of their presence, objected "to going forward with the case" because all of the commissioners had read the news article. Counsel pointed out that the article informed the commissioners of facts that were inadmissible in evidence and that the article in general was "prejudicial to the cause of the landowner."

The court stated:

"Of course, if both of you object, I'll have to dismiss them, [commissioners] but I hope—I think it is most unfortunate that the newspaper article came out, bringing before the Commissioners information which they should not receive, and which I think, if it came out as evidence, would require that any award be set aside.

"I am going to go ahead and overrule the objection of the landowner, until after the award is brought in, you may if you wish file exceptions, and at that time we can have more opportunity to look at the law.

"I must say that I was shocked to see this article and this information in it in the newspaper yesterday, just the day before we went to trial.

"And I will make a statement to the Commissioners to disregard this."

Whereupon, the court instructed the commissioners to completely disregard any facts or figures contained in the article and to try the case solely on the evidence presented at the trial, the view of the premises and the instructions. The court asked whether they felt they could do so and give the parties a fair trial. Each commissioner indicated in the affirmative. The trial proceeded and the commissioners, in their report, ascertained the just compensation to be $14,750 for the land taken, together with the permanent and

temporary easements. No compensation was awarded for damages to the remaining property of the landowner.

Mrs. Siegfried filed exceptions and amended exceptions to the commissioners' report and moved the court to set aside the award and to grant her a rehearing of the matter. By order entered January 8, 1964, the court overruled her exceptions to the commissioners' report, and by final order entered January 10, 1964, it overruled her motion to set aside the award and her motion for a rehearing and confirmed the award. It is from the final order that Mrs. Siegfried has appealed.

Mrs. Siegfried's six assignments of error raise essentially four questions which may be stated as follows: (1) Did the court err in permitting the trial to proceed as scheduled on May 21, 1963, in light of the newspaper article published on May 20, and in later refusing to grant defendant a rehearing? (2) Did the city make a *bona fide* effort to purchase defendant's land? (3) Was the award of the commissioners inadequate? and (4) Did the court err in refusing to grant defendant a rehearing on the ground of after discovered evidence?

The critical question presented is whether the court erred in permitting the trial to proceed in view of the newspaper article published the day before trial which was read by all of the commissioners. Mrs. Siegfried contends, among other things, that the article contained certain prejudicial information that was not admissible in evidence at the trial; that the city attorney was responsible for the appearance of the article, and that the court should have dismissed the commissioners appointed and set the hearing for a later date.

The city, on the other hand, takes the position that the article was not editorialized; that it set forth bare facts, many of which had appeared in previous news stories on the Emmet Street project; that the court's examination of the nine freeholders and the five commissioners who were appointed from them disclosed that they would not be biased or prejudiced by the article and could give the parties a fair and impartial trial based solely on the evidence presented, the view and the court's instructions; that such a trial was had, and that the court did not err in permitting the trial to proceed.

There is no fixed standard to serve as a test in all cases as to what constitutes "bias or misconduct of or affecting the commissioners or jurors as will warrant setting aside the award." Each case must be decided upon its own particular facts and circumstances. *Temple*

v. *Moses*, 175 Va. 320, 336, 8 S.E. 2d 262; 29 C.J.S., Eminent Domain, § 311, p. 1344.

The record does not indicate that the city attorney supplied information to the newspaper and the radio in order to gain for the city an unfair advantage over Mrs. Siegfried, and we do not think that he did so for that purpose. However, the news stories originated in his office through his actions and he must therefore accept some responsibility for their publication. He frankly admits in his brief that "his statements to the news media may have been unwise" and that "[s]ubsequent events have made an indelible impression of this fact upon him."

It is manifest from a reading of the newspaper article that it contained statements that were prejudicial to Mrs. Siegfried and were not admissible in evidence at the hearing. The very first headline of the article stated: "City Offers $12,717" for the land in question, and this fact was repeated in the first sentence of the body of the story.

It is well settled that offers made by the condemning party to the landowner are in the nature of an attempt to compromise and cannot be proved. *Ryan* v. *Davis*, 201 Va. 79, 84, 109 S.E. 2d 409; *Duncan* v. *State Highway Commission*, 142 Va. 135, 141, 128 S.E. 546; 2 Lewis, *Eminent Domain*, (3d. ed.), § 666; 6 M.J., Eminent Domain, § 88, p. 776. See also Code, § 33-70.6 which relates to eminent domain proceedings instituted by the State Highway Commissioner and prohibits the introduction in evidence of any amount deposited by a certificate of deposit or any amount accepted by the person entitled thereto.

With regard to the statement in the article concerning a condemnation award made to Gulf Oil Co. for land taken and for damages to its service station on Emmet Street near Mrs. Siegfried's land, it is clear that evidence relating thereto would have been inadmissible at the trial if offered. "It is generally the rule that the sum paid by the condemner for similar land is not admissible because it is usually not a fair indication of market value. * * * This rule of exclusion applies unless the offering party produces evidence sufficient to establish that the sale was not by way of compromise but voluntary and free from compulsion." (Citing cases.) *Collins* v. *Pulaski County*, 201 Va. 164, 171, 110 S.E. 2d 184. Since Gulf Oil Company's property was condemned by the city it cannot be said that the sum paid by virtue of the commissioners' award was

"voluntary and free from compulsion." Hence, the general rule of exclusion would apply.

The article also contained other inadmissible or prejudicial statements. It set forth that the suit against Mrs. Siegfried was the second of three such proceedings; that "Two dozen parcels" had been purchased without condemnation for the project, and that Jack N. Kegley, Mrs. Siegfried's attorney, was also counsel for the landowner in the third proceeding which had not been tried. As Mrs. Siegfried argues, the commissioners could have readily inferred from reading the article that she and her counsel were "holding out" and were not willing to sell the land for public use as the owners of 24 other parcels had done and that in light of the city's offer of $12,717 her asking price of $400,000 was unreasonably exorbitant. In short, the article contained inadmissible or prejudicial information which placed her in an unfavorable position before the commissioners. The trial judge stated that he was "shocked" when he saw the article in the newspaper "just the day before we went to trial."

It is true that the commissioners, when examined, informed the court that they could disregard the contents of the news article and give the parties a fair trial based on the evidence presented, the view and the court's instructions. They were not polled separately nor were they advised specifically that the objectionable information was improper for them to consider. It cannot be overlooked that the article was published on the afternoon immediately preceding the trial and that the prejudicial information was freshly imprinted upon the minds of the commissioners. Under these circumstances, the mental processes of at least one of the commissioners could have been subtly influenced by the article during the trial of the case, and we cannot say with reasonable certainty whether or not the award was affected. As we said in *Collins* v. *Pulaski County*, *supra*, 201 Va. at p. 169: "[I]t is important that their judgment be not affected by * * * extraneous matters."

We are not unmindful of the fact that in *McGuire* v. *Howard*, 203 Va. 965, 970, 128 S.E. 2d 281 we held in effect that the trial judge's judgment on a motion to set aside a verdict and grant a new trial based on the misconduct of a juror should be upheld unless he abuses his discretion. We also said that only slight evidence of influence or prejudice as a result of such misconduct need be shown to warrant the granting of a new trial. The same principles apply where commissioners are involved.

We hold that under the particular facts and circumstances of this case the trial court abused its discretion and erred in proceeding with the trial over defendant's objection, in not dismissing the commissioners, and in refusing to grant defendant a rehearing.

The trial court ruled that the city made a *bona fide* effort to purchase defendant's land before the condemnation proceeding was instituted. Upon the record before us we cannot say that the court erred in so ruling.

In view of our holding it becomes unnecessary to discuss the other questions raised.

For the reasons stated, the judgment appealed from is reversed and the case is remanded for a new trial.

*Reversed and remanded.*