## 𝔖taunton

JACOB HEVENER, JR. v. COMMONWEALTH OF VIRGINIA.

September 7, 1949.

Record No. 3555.

Present, All the Justices.

The opinion states the case.

*Wayt B. Timberlake, Jr.*, and *Richard W. Smith*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Ballard Baker, Assistant Attorney General*, for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

The accused, Jacob Hevener, Jr., was indicted for the murder of his sister-in-law, Arlene Hudson Hevener. The indictment was of the short form as provided for under section 4865 of the Code (Michie). It charged, "That on the 28th day of March, in the year one thousand nine hundred and forty-eight, in the said City of Staunton, Jacob Hevener, Jr., feloniously did kill and murder one Arlene Hudson Hevener, against the peace and dignity of the Commonwealth of Virginia."

Later counsel for the accused requested a bill of particulars which was furnished by the attorney for the Commonwealth. In the bill of particulars it was stated that the Commonwealth "expects to prove in this case that Jacob Hevener, Jr., did on or about the 28th day of March, 1948, wilfully, deliberately, maliciously and feloniously assault Arlene H. Hevener, and strike and beat her upon her head, face and various other parts of her body, thereby inflicting divers wounds upon her head and body, from which or as a result of which she died." The word "premeditatedly" was left out.

After an unsuccessful attempt to secure the proper number of veniremen from the city of Staunton, the court entered an order for a charge of venire. Thereupon, a venire summoned from Rockbridge county was secured and a jury for the trial of the case selected. On the second day of October, 1948, the jury rendered its verdict of guilty of murder in the second degree against the accused and fixed his punishment at sixteen years in the penitentiary. Motions were made to set aside the verdict but they were overruled and the judgment of the court was entered upon the verdict.

The accused, at the time of the death of Arlene H. Hevener, was a single man, thirty-five years of age, and had returned to Staunton late in 1945 from four years' service in the United States army. For the greater portion of the time after his return, until his arrest, he had made his home at the residence of his brother and sister-in-law, Arlene

H. Hevener. He was, and had been since he left the army, unemployed.

Arlene H. Hevener, who had been married to Harold McN. Hevener, the older brother of the accused, since March 6, 1928, was a professional nurse and continued her nursing career in Staunton during her married life. She was forty-four years of age at the time of her death.

Mrs. Hevener and her husband lived together in their home in Staunton until September, 1947, when he went to Richmond to an institution for treatment as an alcoholic. He remained in Richmond until the death of his wife. From the time he left Staunton, the accused and Arlene occupied the home together. Some time in 1946 they became infatuated with each other. This continued until the death of Arlene. The mother of the accused made efforts to terminate the relationship between her son and her daughter-in-law, but without avail.

On several occasions Arlene had sustained accidents in the home which resulted in more or less severe injuries. On one occasion she fell down the basement steps and had a concussion of the brain. On another occasion while carrying a kettle of boiling water she slipped and was severely scalded on her leg. On Saturday, March 27, the accused and Arlene agreed to quit drinking. This was the result of a conference between the accused, Arlene, and her husband, and the mother of the accused. The mother agreed to make her home with them on that condition. This agreement was almost immediately violated. On that night or early the next morning Arlene Hevener received injuries in her home from which she died in the hospital on March 31. She was taken to the hospital on March 29 while unconscious, and died without ever having made any statement or without having regained consciousness. At that time she was residing with the accused, and on the night of March 27 or the early morning of March 28, they were the only two persons present. The accused stated that from around 11:00 p. m. on March 27 until the following afternoon he did not recall what had happened. He also stated that when he

aroused on the next afternoon, which was Sunday, he went into the bedroom of Arlene and found her lying unclad upon the bed. He thought she was drunk. He attempted to arouse her but without success. He ordered sedatives from the drug store in order to sober up, and he also ordered some ointment to treat burns on Arlene's stomach, but he did not notice her head injuries or the other bruises on her body. He tried to obtain beer but without success, and he drank more whiskey and went to bed in another room.

On Monday morning the accused found Arlene in the same condition and was unable to arouse her. He stated that at that time he still did not notice the other injuries. He realized later on Monday that she could not be drunk and late in the evening called a physician. The physician arrived around 7:30 to 8:00 p. m. and realized that Arlene was in a serious condition and should be sent to the hospital. Over the objection of the accused, and upon the insistence of the physician, she was taken to the hospital on Monday night.

Upon her arrival at the hospital an examination revealed a head injury with a possible subdural hemorrhage, second degree burns on the abdomen and thighs, and multiple contusions on the arms, thighs and eyes. On Wednesday Arlene died from a severe brain injury and subdural hemorrhage.

Two police officers of Staunton testified to previous trouble between Arlene and the accused. This trouble occurred on March 11, 1948, sixteen days before Arlene's death. They were called by Arlene to her home. There they found only Arlene and the accused present, and were told by Arlene in his presence that he had "beat her all over the house". She also requested the officers to "take him out of here before he kills me." He then stated that he was going to kill her. There were blood smears in the bathroom and in the bath tub. The officers testified that while the accused had apparently been drinking he was not drunk, not having drunk enough to be arrested for drunken-

ness, and that Mrs. Hevener was not drinking. On this occasion they took the accused to his mother's home, but at around two a. m. the officers received another call from the Hevener home, and upon arriving there found that the lock on the back door had been broken, and at 2:50 a. m. the accused was picked up in front of the Hevener home and placed in jail for drunkenness, where he remained for two days.

On the night of March 27, C. D. Brooks, a taxi driver, made two trips to the Hevener home with liquor. At 7:15 p. m. on that date Brooks entered the home and received from Mrs. Hevener a check and with it bought a fifth of whiskey. At 11:17 p. m. Brooks was again called to the Hevener home. On this occasion Mrs. Hevener refused to give a check for additional whiskey and the accused took a radio that was in the home and went with Brooks to get the whiskey, paying for it with the radio. When they returned the accused went into the house.

On the next morning, which was Sunday, Brooks was called by the accused to come to the Hevener home but he did not respond. The call was received by the taxi company at its office at 4:13 a. m. On Monday, March 29, Brooks received another call from the accused at 7:00 p. m. In response, he drove the accused to the Kings Daughters Hospital in Staunton where he talked with his mother who was at the hospital. He was then taken back to the Hevener home in the taxi. On Tuesday, March 30, Brooks again saw the accused on Route 250 in another taxi. At this time the accused got in the taxi with Brooks and told him that Mrs. Hevener was in the hospital. He stated, "I beat her and put her there".

The accused testified that he had no recollection of anything that happened from the time he got the second bottle of whiskey on the previous Saturday night until Sunday afternoon. He stated that he did not recall that he had ever threatened Mrs. Arlene Hevener, and he denied that he told Brooks that he had beaten her.

There are five assignments of error. First, that the *corpus*

*delicti* was not established; second, that O. E. Shields was not a proper juror; third, that the statements made by Mrs. Hevener to the officers at her home sixteen days before her death were improperly admitted in evidence; fourth, that defendant's instruction "J" was improperly refused; and fifth, that the instructions granted on behalf of the Commonwealth on first degree murder should not have been granted. Necessarily there will be some repetition in the discussion of the several assignments.

Counsel for the accused argue that there is no evidence of how the deceased was injured, that no reason was shown for the accused to injure her, and that no means were shown by which the injuries were inflicted. They also argue that the accused was unable to describe how the deceased suffered the burns on her abdomen, or how the head injury had been inflicted, and that inasmuch as the Commonwealth had not shown the criminal agency by which the fatal injuries were inflicted the *corpus delicti* had not been proven. Again they argue that the essential question of the proof of the criminal agency rested solely upon the accused's inability to explain the injuries, which might or might not have been accidental.

The argument of counsel entirely ignores the medical testimony. One of the physicians testified that the deceased had a head injury with subarachnoid and possible subdural hemorrhage, and that she had second degree burns on the abdominal wall, lower chest and upper thighs, and multiple contusions on both arms, thighs and eyes. One physician said that the head injury, in his opinion, must have caused immediate unconsciousness which continued until her death. Counsel's argument also ignores the statement of the accused, made sixteen days before the homicide, to the effect that he intended to kill Arlene, and her statement to the officers at that time and in his presence that he had "beat her all over the place". At that time, namely, sixteen days before the homicide, one physician testified that he attended her after she had been beaten and she then had a black eye and a cut under the eye. She was in bed crying and hysterical.

The argument of counsel also ignores the admissions of the accused made to the taxi driver, Brooks, after the fatal injuries were inflicted, that he had "beat her and put her there", (meaning the hospital.)

There was no evidence that she had an accidental fall on the night of March 27 which caused her fatal injuries. How she received the burns on her abdomen is not shown. However, it is shown that these burns did not cause her death. Simply because she had had an accidental fall previously, causing a concussion, is not alone sufficient to show that she received her fatal injuries at a later date in that way. Certainly the jury could have found that the fatal injuries were not accidental and in making this finding the jury could have considered, along with other evidence, the fact that the accused failed to get medical attention for Arlene until Monday evening, nearly two full days from the time she was injured, and thirty-six hours after he had actually discovered her in her helpless condition, and that the accused objected to her hospitalization.

The medical testimony and the direct and circumstantial evidence were sufficient to take to the jury the question of whether the death of Arlene was caused by a criminal agency. It was also sufficient to justify the jury in concluding that the accused committed the homicide by administering to Arlene a severe beating from which she died.

Recently this court has had occasion to add other cases to the long list in Virginia in which the question of *corpus delicti* has been treated. See *Harrison* v. *Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136; *Bowie* v. *Commonwealth*, 184 Va. 381, 35 S. E. (2d) 345, and *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273. The Virginia cases leave no doubt that the question of the *corpus delicti* in this case was for the jury under all of the facts and circumstances.

Next it is contended that juror Shields, who had been accepted by the court, was not impartial. On his *voir dire* examination he said he had read some of the articles in the Staunton newspapers concerning the death of Arlene Hevener and from them he was of the opinion that a crime

had been committed but that he had no opinion as to who committed it.

The Staunton newspapers published a considerable number of articles about this tragedy, the propriety of some of which might have been open to question. These articles may have been responsible for the failure of the court to obtain a jury free from exception in the city of Staunton. After an unsuccessful effort to obtain a jury from Staunton, the court granted a change of venire and ordered a jury from the adjoining county of Rockbridge. Juror Shields was on that venire.

After juror Shields had stated that he had formed an opinion that a crime had been committed the court gave him a searching examination, which developed that he knew nothing about the case, that he had not read all of the articles that had been written in the newspapers, that he had not made up his mind that the accused was guilty, and that he could serve on the jury and give the accused a fair and impartial trial. Thereupon he was accepted as a juror over the objection of the accused.

Perhaps it would have been more desirable under the circumstances if this prospective juror had been rejected, but we are to decide whether it was reversible error to allow him to serve. The issue of whether a member of the venire is a proper juror is for the trial court. Its decision on that issue is to be accorded weight. Better than anyone else, it can gauge the candor of the juror and his purpose to give a fair judgment on the evidence. *Ballard* v. *Commonwealth*, 156 Va. 980, 159 S. E. 222; *Temple* v. *Moses*, 175 Va. 320, 8 S. E. (2d) 262, and *Abdell* v. *Commonwealth*, 173 Va. 458, 2 S. E. (2d) 293.

In *Slade* v. *Commonwealth*, 155 Va. 1099, at page 1106, 156 S. E. 388, we said: "The finding of a trial court that a juror is competent after an examination on his *voir dire* ought not to be set aside unless it is plainly manifest that an error has been committed. The candor, interest, fairness, prejudice and bias of a juror are elements for the consideration of the trial judge in determining a juror's competency,

and only when the juror's examination shows conclusively that he has a disqualifying opinion should the appellate court reverse the decision of the trial court."

A careful consideration and interpretation of what was disclosed on Shield's *voir dire* examination makes it plain that he had no disqualifying opinion, nor any fixed view as to whether Mrs. Hevener met her death through crime or an accident.

As we have already stated, on March 11, 1948, sixteen days before Arlene Hevener received her fatal injuries, having called the police on account of the treatment she had received from the accused, she made the statement to the officers in his presence, and he made the threat previously set out.

Counsel for the petitioner assigns as error the court's ruling in admitting the statements made by Mrs. Hevener on the ground that those statements are hearsay.

Later one of the officers testified in answer to this question, "Did you stay there any length of time?", to which he replied, "I did not. She asked me to stay—". Before he could complete his answer counsel had interposed an objection. We do not think that this last incompleted answer of the officer could have in any way prejudiced the accused.

The other statements made in the presence of the accused and not denied by him at the time would seem to have been admissible as a part of the conversation in which the accused threatened to kill Arlene. He was bound to have heard these statements of Arlene for he was present, and while he had been drinking, he was not drunk. He not only made no denial of her statements, but in response said to Arlene, "I am going to kill you". Of course, this threat was properly admitted. Obviously it was provoked by the two statements of Arlene. Her statements and the threat are so closely united that it was proper to let the statements go in with the threat.

Complaint is made of the refusal of the court to grant instruction "J", offered on behalf of the accused. It again defined the crime of voluntary manslaughter, and permitted

finding the accused guilty of that crime if the jury believed certain recited facts, most of which had already been recited in two other instructions granted for the accused.

The two other instructions which, as indicated, were granted on behalf of the accused, defined the crime of manslaughter. These, in our opinion, were entirely sufficient to present to the jury the theory of the accused on this point. Additional instructions in this respect would have been repetitious and likely to have caused the jury to conclude that the court thought the case was one of manslaughter rather than murder. Numerous instructions on one point place undue emphasis thereon and might cause the jury to give undue value to that phase of the case to the exclusion of other phases.

Finally it is urged that instructions defining murder in the first degree were erroneously granted. This contention is grounded upon two propositions—first, that there was no evidence of murder in the first degree to support the instructions, and second, that inasmuch as a bill of particulars had been furnished by the attorney for the Commonwealth which failed to include the word "premeditatedly" first degree murder was thereby eliminated from the case.

From the recital of the facts it is quite clear that there was evidence of murder in the first degree. This evidence, along with all of the other significant circumstances was sufficient to support first degree murder instructions.

The substance of the indictment and of the bill of particulars was set out at the beginning of this opinion. The indictment, statutory in form, embraces a charge of murder in the first degree, along with a charge of murder in the second degree and manslaughter. The common law and statutory definitions of murder in the first degree are no longer necessary to be placed in an indictment. The bill of particulars, with the exception of omitting the word, "premeditatedly", also embraced murder in the first degree, and conformed to the old form of indictment for homicide. All of the other essential words under the old form are there, "he wilfully, deliberately, maliciously and feloniously",

appear in the bill of particulars. It would be highly technical to hold that the omission of one word from the bill of particulars would be sufficient justification for setting aside the verdict and judgment in this case, especially when that word no longer is necessary in an indictment for homicide. Of course, the evidence must show premeditation in order to prove murder in the first degree, but that is entirely different from having to place that word in an indictment or in a bill of particulars.

The accused would have us say that the first degree murder charge in the indictment was nullified by reason of the bill of particulars. He was not to be tried upon the bill of particulars, but only upon the indictment. The two instruments were to be read together.

It is rather a late day for the accused to say that he did not know that he was being tried for murder in the first degree when he heard the *voir dire* examination of the jurors, interrogating them as to whether or not they would be willing to impose capital punishment if the evidence justified it. He must have known then that a conviction of first degree murder would be sought.

He also sat by and heard evidence going to the jury which tended to support a charge of murder in the first degree without objecting. If he thought at that time that the charge of murder in the first degree had been eliminated and that he would be tried for no higher offense than second degree murder, he should have objected to that evidence. If he had done so and there had been merit in his objection, it is quite likely the court would have permitted an enlarging amendment to the bill of particulars if it were insufficient, making it conform to the evidence. However, we do not think the bill of particulars was insufficient. If the indictment no longer requires the old common law technical words, they should not still be required in a bill of particualrs.

■ The purpose of a bill of particulars is to state sufficient facts regarding the crime to inform an accused in advance of the offense for which he is to be tried. He is entitled to no more.

Here the accused was informed in the bill of particulars that he feloniously assaulted Arlene Hevener, that he struck and beat her upon her head, face and other parts of her body, and inflicted wounds upon her head and body from which she died. This furnished the accused, in plain terms, the elements of the offense for which he was to be tried. He could not have been told in clearer words.

See *Livingston* v. *Commonwealth*, 184 Va. 830, 36 S. E. (2d) 561, and *Webster* v. *Commonwealth*, 141 Va. 589, 127 S. E. 377.

The foregoing considerations are sufficient to clearly distinguish *Webster* v. *Commonwealth*, *supra*.

We find no reversible error in the judgment of the court and therefore it is affirmed.

*Affirmed.*