## Richmond

KENNETH RAYMOND HOLLAND, JR. v. COMMONWEALTH
OF VIRGINIA.

October 10, 1949.

Record No. 3574.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Gordon E. Campbell* and *W. R. Ashburn,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Ballard Baker, Assistant Attorney General,* for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

The accused, Kenneth Raymond Holland, Jr., was tried by a jury, found guilty of murder in the first degree and his punishment fixed at twenty years in the penitentiary. Judgment was entered approving the verdict and he was accordingly sentenced.

On June 17, 1948, around noon, the body of one Charles Everett Utt was found in the back of his automobile, lying on the floor. He had been severely beaten about the head, apparently with a hatchet. The accused became 29 years of age on the day of his trial below, and had been a lifelong resident of the city of Norfolk, residing with his father. He graduated from Fork Union Military Academy and thereafter entered the army, participating in the African campaign where he was twice wounded. His wounds resulted in physical disability and he was honorably discharged. After he returned to Norfolk he was employed by the City Police Department as a motorcycle officer and served until February, 1947, leaving the department voluntarily. At the time of his trial he was unemployed and had been for several months, living on the compensation paid him as a disabled, discharged veteran.

Holland met one Mary Lee Utt, the wife of Charles Everett Utt, the deceased, prior to the time he went overseas with the army. She then worked in a Norfolk restaurant known as the Dude Ranch, as a waitress, and upon his return after his discharge, they renewed their acquaintanceship. For more than five years thereafter and until the homicide they frequently went together with the knowledge of the husband.

On June 17, 1948, the Norfolk county police headquarters received a telephone call to investigate an automobile parked on New York avenue in a colored residential section of Norfolk county. County officers responded and found a 1947 Ford coupe in which there was a man's body on the floor behind the front seat. At that time he was unknown to the police officers. The county coroner was called and also certain detectives of the Norfolk City Police Department. The condition of the body indicated that the deceased had been killed probably by blows of a hatchet. The coroner said, "the man's feet and all were muddy; his hands were muddy, and under his fingernails and all showed as if he had been clawing the dirt. He was stuck with mud. The front of the car had mud in it on the front seat and floorboard."

The coroner was of opinion that the deceased had been dead some 12 to 14 hours. An autopsy disclosed food in the stomach of the deceased which ordinarily would have been digested in from three to four hours.

The deceased was dressed in a blue sweat shirt on which was stamped the name of C. E. Utt, and in blue dungarees. In the glove compartment in the dashboard of the car was found an I. D. card and driver's license containing the name of Utt. It was concluded that the man was Charles Everett Utt. There were no keys in the automobile nor any weapon, but there was a newspaper on the floor in the front upon which was a well-defined heelprint, some dirt, and considerable blood. The car also contained an empty whiskey flask and three glasses, a lady's umbrella and a bag of cement. No money was found on the person of the deceased but one or two cents were on the floor of the car.

After the police had concluded that the body was that of Charles Everett Utt, they sought out his home, and late Thursday, the 17th, it was located by them at 523 Gladstone Road in Norfolk county, in a housing project of recent construction, and one in which the streets had not been completed. The police did not believe that Utt had been killed at the point where the car was found, but upon examination

of the surroundings at the home of Utt, they concluded that he must have been killed in a lane in the rear of his residence, at a point 280 feet from the residence. At that point they found blood on the ground, footprints, and an impression in the mud where the officers thought the body had lain. This point was three miles from the place where the automobile containing the body had been found.

There was no one at home at the Utt residence when the officers arrived. They gained entrance by the use of a pass-key. On the table in the diningroom was a photograph of Mary Lee Utt, the widow of the deceased. She was recognized by one of the officers who knew her. He also knew that she had been having dates with the accused. The officers then went to the home of the accused at 1:30 a. m. on Friday morning. They found him asleep, and after being awakened he appeared in his night clothes. He invited the officers in in a normal manner and did not appear to be nervous or upset by their visit. The officers were invited into the bedroom and there, lying on the floor, was a pile of soiled clothing which included a pair of khaki pants, a grey police shirt, and underclothes, which contained blood on them. The accused was interrogated as to the presence of the blood on the clothing and, without hesitation, explained that on the preceding Wednesday he had been engaged in a fist fight with a man named Tomblin, who lived across the street. The fight resulted in injury to the inside of the mouth of the accused. Tomblin was badly beaten, sustaining a broken nose and broken jaw, and he bled profusely. The fight occurred in the home of the accused, and considerable blood was thrown upon the walls, some furniture, and on the floor.

Wednesday afternoon Tomblin requested Holland to go to the liquor store for a bottle of whiskey. He complied with this request and carried it to Tomblin's home, where they had another altercation which did not result in the exchange of blows because Tomblin's wife separated them. At this time Tomblin was still bleeding from the nose and

from an injury on his ear. The accused testified that upon this second occasion other blood spots were made upon his clothing.

The officers took charge of the bloody clothing and a pair of low-quarter shoes which had blood spots on them. They arrested the accused and placed him in jail.

The officers thought that at the point where they believed the homicide was committed there were one or more foot prints which might have been made by a boot rather than a shoe. They knew that the accused, as a motorcycle officer, owned leather boots, so they returned to his home about 10 p. m. on Friday night while he was in jail and procured from his father the leather boots. They were found in a pantry adjoining the kitchen where they were customarily kept, and were not concealed except by the ordinary articles that are usually thrown on the floor in such a pantry. The boots contained mud on them and traces of blood. Holland testified that he wore the boots on the occasion of the second altercation with Tomblin, but previously Officer Williams had testified that the accused told him at the time of the arrest that he had not worn the boots for some time.

Mrs. Utt is smaller than the accused, and she was in Pennsylvania at the time of the happenings, living temporarily with Mr. Utt's family. Utt had also been in Pennsylvania, and the accused thought he was still there, according to his testimony.

The last known of Utt before his death was disclosed by the testimony of a Mrs. Annis who lived next door. She said that on Wednesday evening prior to the night he was killed he had dinner in her home between five and six o'clock in the evening, and left at dark. She was corroborated by her husband.

Fingerprint experts made a careful examination of the automobile in which the body was found in an attempt to develop some circumstance which would have connected the accused as the guilty agent. In this they were unsuccessful. They did find the handle of a hatchet in the rear of and not far

from the Utt home. It and other exhibits were taken to the Federal Bureau of Investigation at Washington for microscopic comparison, chemical analysis and other available scientific tests.

The purpose of the police in doing this was to attempt to ascertain whether the blood found on the clothing and boots or shoes of the accused was the blood of the deceased, or of a similar type; whether the hairs found on Holland's clothing were hairs from the body of Utt; whether the dirt samples from the automobile of the accused and from the automobile in which the body was found were similar, and whether these samples were similar to the samples of dirt selected from the point where the police had concluded the crime had been committed. A plaster of Paris cast of the clearest bootprint at the scene was made and the officers were desirous of learning whether the boot of the accused fitted the bootprint. The police were interested to learn whose heelprint had been impressed in the newspaper found on the floor of the automobile in which the body was. They were also interested in ascertaining whether the blood there could be identified as the blood of the deceased and the heelprint as the print of the shoes or boots of the accused.

The report from the Federal Bureau of Investigation was unsatisfactory from the standpoint of the investigating officers. The report did not disclose that the blood from the body and that found upon the clothes of the accused were even of the same type. The mud or dirt from the boots of the accused was not found to be the same as the samples that were secured from the supposed scene of the crime or of that in the automobile in which the body was found. There was no finding that the boot or shoe track at or near where the crime was supposed to have been committed was made by the boot or shoe of the accused. The heelprint on the newspaper was not made by the boot or shoe of the accused.

In an attempt to place the accused in the community in which the crime was supposed to have been committed, the

Commonwealth introduced witness Alver, who testified that he had seen the accused on Wednesday evening, the 16th of June, at 10:30 p. m., in Tegg's Log Cabin, a beer parlor located a mile or more from the alleged scene of the homicide. The witness attempted to describe the wearing apparel of the accused at that time, and claimed that he had a conversation with the accused. His information was not given the officers until some two weeks after the crime had been committed and until after the witness had been arrested by the same officers, during which time an investigation of the complaint was being made by the officers. It is claimed by the accused that the testimony of this witness is entitled to no credence because it was obvious that he was trying to ingratiate himself with the officers in order to help his own case.

The accused had received a postcard from Mrs. Utt, sent from Pennsylvania, saying that she would return on Sunday night, the 13th, and she requested him to call at their home on that evening. He made the call but no one was present, and again on the 14th he found no one at home.

The relationship between the accused and Mrs. Utt was not concealed by him. They had been close friends for at least five years. He frankly admits the relationship, but he claims, and other witnesses so testified, that his relationship with Mrs. Utt was with the knowledge of her husband.

One Phoebe Washington, a colored woman living a very short distance from where the automobile was parked, testified that it was driven there at midnight on Wednesday, the 16th; that a man and woman alighted from the car, and the woman was taller that the man. On the following day a woman who saw the body in the car called the police. As we have stated, it was clearly proven that Mrs. Utt was smaller than the accused, and she was in Pennsylvania at that time.

There might be some doubt as to the existence of a motive on the part of the accused to kill Utt. He had known of the attentions of the accused to his wife for more than five

years, and so far as the evidence disclosed he made no protest. In any event, the presence or absence of motive is not sufficient to establish guilt or innocence in a case of this nature. If the accused carried on a clandestine love affair with Mrs. Utt, this alone is not sufficient to prove his guilt.

There are a few inconsistencies and conflicts in the testimony—for instance, as we have already stated, the accused testified that upon his second encounter with Tomblin, in the Tomblin home, he wore his boots, while Officer Williams testified that on the night they arrested the accused he stated that he had not worn the boots for some time. There is also some conflict as to the apparel worn by the accused on the occasions when he had his altercations with Tomblin and on the night of the 16th, but if it be assumed that the accused was incorrect in his testimony as to these things, there still is not sufficient evidence to show that he killed Utt.

It was necessary in order to secure a conviction that the Commonwealth prove beyond a reasonable doubt that the accused was present at the time and place of the homicide. The Commonwealth claimed that this was so proven by the witness, Alver, who said he saw the accused at 10:30 on the night of the homicide at the beer tavern. This place was a mile or more away from the scene of the homicide, and in between it and the scene there were living some five thousand people. If it be true that the accused was seen by the witness, Alver, at the beer tavern, as detailed by him, we do not think that fact alone would be sufficient to justify an inescapable conclusion that the accused was present at the time and place of the homicide.

Without indulging in speculation and improper presumption and inference no finding of guilt can properly be sustained under the evidence. To conclude that the accused committed the homicide we would necessarily have to presume that he was wearing the exhibited clothes and boots at the time of the killing; that the blood on the clothes and boots was that of Utt; that the automobile of Utt was parked at the scene at the time of the killing; that the ac-

cused was present at the time and place of the killing; that the accused moved the body in the automobile to the point where it was found, and that he removed all traces of his presence from the automobile, including the wiping of the steering wheel, so that no fingerprints could be obtained. Such a presumption would be entirely unwarranted and not supported by any evidence or reasonable and proper inferences that could reasonably be drawn therefrom.

The report of the Federal Bureau of Investigation constitutes no proof of any fact that sustains a finding that the accused is guilty. It is entirely lacking in that respect in addition to being very indefinite and uncertain.

If we consider as true all of the evidence introduced on behalf of the Commonwealth and all of the reasonable and just inferences which might properly be drawn therefrom, we do not have an abiding conviction that the accused was the murderer.

In *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273, we approved the statement quoted from *Sutherland* v. *Commonwealth*, 171 Va. 485, 198 S. E. 452, that " 'It is elementary in this State, except as modified by statute, that the accused, in a criminal case, is presumed to be innocent until his guilt has been proven beyond a reasonable doubt. The burden of proof of guilt is upon the Commonwealth. This burden continues throughout the trial and never shifts. The presumption of innocence is so strong that not only is the accused entitled to the benefit of it, but if the case be a doubtful one, the persumption is sufficient to turn the scale in his favor. It has been repeatedly held that it is not sufficient that the evidence creates a suspicion or probability of guilt; but it must go further and exclude every reasonable hypothesis except that of guilt. Nor, where a fact is equally susceptible of two interpretations, one of which is consistent with the interpretation of accused, may the jury arbitrarily adopt that interpretation which incriminates him. The failure of the Commonwealth to point out, or the defendant to name the guilty party, is not allowed to prejudice

the presumption of innocence in favor of the defendant. *Dixon* v. *Commonwealth*, 162 Va. 798, 173 S. E. 521; *Triplett* v. *Commonwealth*, 141 Va. 577, 127 S. E. 486; *Spratley* v. *Commonwealth*, *supra*, 154 Va. 854, 152 S. E. 362.' "

And in *Garner* v. *Commonwealth*, 186 Va. 600, 43 S. E. (2d) 911, we said: "The burden rested upon the Commonwealth to prove beyond a reasonable doubt the criminal agent responsible for the crime. No burden rested upon the accused. He stood upon the legal presumption of innocence which went with him throughout the trial." That elementary statement of the law is clearly applicable to the facts in the instant case.

In *Thomas* v. *Commonwealth*, 187 Va. 265, 46 S. E. (2d) 388, we reiterated the principle, "The evidence does not exclude every reasonable hypothesis except that of guilt. The facts are, at least, equally as susceptible of an interpretation which is consistent with the innocence of the defendant as with his guilt."

A host of cases dealing with the sufficiency of circumstantial evidence to establish a conviction in a criminal case are cited, quoted from and discussed thoroughly in the *Smith*, *Garner* and *Thomas Cases*. What is said there need not be repeated.

There are other assignments of error with which we will not be concerned, as it is the view of the court that the judgment of the trial court should be reversed and the verdict of the jury annulled because they are not supported by the evidence.

The case is remanded for a new trial if the Commonwealth be so advised and can present any additional or substantial new evidence.

*Reversed and remanded.*