# Richmond

RALPH A. NEWBERRY v. COMMONWEALTH OF VIRGINIA.

October 10, 1950.

Record No. 3723.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*J. Livingstone Dillow*, *W. B. Snidow* and *David E. Repass*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Henry T. Wickham, Assistant Attorney General*, for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

The petitioner, Ralph A. Newberry, was jointly indicted with his brother, Samuel L. Newberry, for the murder of the former's wife, Mary Katheryn Newberry, in January, 1949. The indictment was of the statutory short form. He elected to be tried separately, and requested a bill of particulars, which was duly filed, but which was alleged to be insufficient. The court held that it was sufficient.

The case was tried by a jury which tendered a verdict of *second degree* murder against the accused and fixed his punishment at twenty years in the penitentiary. The court refused to accept the verdict, and at its suggestion it was amended so as to find the accused guilty of murder in the *first degree* and his punishment fixed as twenty years in the penitentiary. The court accepted that verdict and entered judgment thereon over the objection of the accused.

In August, 1948, Ralph Newberry married one Mary Katheryn Suiter. Samuel was unmarried. They were living on a farm on Walkers Creek in Bland county in January, 1949.

On January 10, 1949, in the nighttime, the sheriff, accompanied by others, found the body of Mary Katheryn Newberry on Big Walker mountain. This was some $3\frac{1}{2}$ miles from the Newberry home. The body was lying below the road with the head completely severed and nowhere to be found. The body was then taken to Wytheville and placed with an undertaker. Ralph waived any claim he had to the body and it was turned over to relatives of the deceased in West Virginia, and buried in Mercer county. The deceased, a young woman weighing approximately 165 pounds, was nearly six feet in height.

When the body was found on the mountainside it was wrapped in a sheet on which was monogrammed the letter "R". It had been placed in a sack and securely tied with binder's twine. It was disclosed that the head had been severed at a point close to the shoulders, and blood was found on the sheet and on the hands of the deceased.

The sheriff went to the home of the Newberrys on Tues-

day, January 11, 1949, and there found Ralph in a drunken condition, arrested him and lodged him in jail, charging him with the murder. At the time the officers arrested him they made a thorough search of his home. Stains were found on a chair in the living room, the floor of the living room, the basement steps, and on the basement floor. A knife with a blade six or seven inches long was also found with a stain on the blade. A stain was also found on a pair of army O.D. trousers which the accused was wearing at the time of his arrest. All of these stains, together with those found on the sheet in which the body was wrapped, were examined in the laboratories of the Federal Bureau of Investigation in Washington, D. C., and it was there determined that the stains were of human blood, known as international group "O". The stains found on the floor in the living room, the basement steps, and on the floor of the basement were also determined to be of human blood, but they were not grouped, and it could not be determined that the stains on the blade of the knife were of human blood.

On January 12, 1949, at approximately seven o'clock in the evening, Ralph, then sober, expressed his desire to tell the truth about the murder of his wife, and he made a statement to Sergeant Helsabeck of the Virginia state police and others, including the coroner of the county. So far as is pertinent to the case, this statement is as follows:

"* * * I don't know nothing myself. I was sitting in the house on the night of the 6th; Sam was there laughing and talking, stepped out on the porch, got the rifle and shot my wife. I went crazy. My wife was sitting by the window. Sam was on settee. I helped Sam carry the body from under the porch and load her in truck. I didn't go with him then; that was Sunday. Yes, I did go with him; he drove and I was with him. That was early. We got back early.

"Sgt. H:—What do you mean early?

"Ralph:—About 5:00 or 6:00 o'clock, before daylight.

\* \* \*

"Sgt. H:—Do you know that when Sam shot her that it killed her?

"Ralph:—Yes, I know it did.

"Sgt. H:—What happened when he shot her?

"Ralph:—She fell back in chair.

"Sgt. H:—Did you see this hunting knife?

"Ralph:—No, I didn't see it.

"Sgt. H:—What caused your brother to do this; had he talked to you about it?

"Ralph:—Beats me. She took care of him, did his washing and ironing; said nothing about it.

\* \* \*

"Sgt. H:—How long did you plan leaving the body where you put it?

"Ralph:—I wasn't going to move it, seeing your wife die.

"Sgt. H:—You mean you were just going to leave it there?

"Ralph:—I don't know what he (Sam) was going to do with it. It was his patient.

"Sgt. H:—Yes, but it was your wife.

"Ralph:—Why it happened, I don't know what would make him do a thing like that.

"Sgt. H:—Where did the body sit in the basement?

"Ralph:—In the back of the basement.

"Sgt. H:—Just lying on the cement?

"Ralph:—Yes.

"Sgt. H:—How long before you saw the body in the basement?

"Ralph:—A couple of days.

"Sgt. H:—When did you help him put the body in the sack?

"Ralph:—I didn't help him. He did that some time Saturday night himself.

"Sgt. H:—You made him do all the dirty work, scrubbing the floors, washing the clothes—excuse me, that's 'burning the clothes'?

"Ralph:—Yes.

"Sgt. H:—Had you questioned Sam as to where the body was?

"Ralph:—Yes, I asked him what he did with it. He said he put it in the basement. It was wrapped in wool sack then.

"Sgt. H:—How long after Sam killed your wife before he cut her head off?

"Ralph:—I'll be durned if I know. He said, 'Good riddance', I started crying.

"Sgt. H:—Did he say anything about cutting her head off?

"Ralph:—No.

"Sgt. H:—Was the head off when you saw her in basement?

"Ralph:—I don't know.

"Sgt. H:—How bad was the head crushed up?

"Ralph:—I don't know. I just saw her shot.

"Sgt. H:—Did you dispose of the body up the mountain or as you came back?

"Ralph:—He turned around on top and dumped the body coming back.

"Sgt. H:—Did you get angry with Sam?

"Ralph:—No, there wasn't any use.

"Sgt. H:—Did Sam tell you why he cut the head off? What's your opinion as to why?

"Ralph:—I imagine he cut it off to get the bullet out so you couldn't tell how she was killed. That's the straight of the thing. I was torn all to Hell and didn't want to talk about it. That's all I can think of."

The deceased was seen on Thursday evening, January 6, 1949, by witness Updike when he went to her home to have his hat repaired. She repaired the hat in about thirty minutes, and he returned the next morning, Friday, January 7, at which time he also saw and talked to her. On Monday, January 10, at approximately five o'clock in the afternoon he asked the accused and his brother where Ralph's wife was and they replied that she was in Bluefield visiting her

mother. He further testified that at that time both Ralph and Samuel appeared to be sober.

On January 9, 1949, which was Sunday, several witnesses testified that they saw the accused and his brother, Sam, driving their truck from the direction of Big Walker mountain, and one of the witnesses said that it was between eight and ten o'clock in the morning. Afterwards several witnesses testified that they saw smoke coming from the chimney of their home and that the odor of the smoke was unusual.

The officers made a thorough examination of the home of the accused in an effort to find a bullet. This effort was unsuccessful. The heating stove found in the living room and the ashes were removed and examined closely. No bullet or the lead therefrom was found in the stove, but pieces of what appeared to be skull bones, human teeth, and wire objects which appeared to be dental bridge work were found in the stove. An X-ray was made of the headless body of the deceased and no bullet was found therein.

It was further shown that the deceased wife had a lower front dental bridge; that her mother had received a postal card from her postmarked January 8, 1949, and written on January 7, 1949. A sister identified the body of the deceased by a black scar on the inside of her right foot. The body was further identified as that of the wife of the accused by finger prints taken after her death and compared with those already in the files of the F.B.I. which were there by virtue of her former employment in the postoffice department at Washington, D. C. The evidence further discloses that the accused was sometimes called "Jack", and that he and his wife had had an argument during September, 1948, at which time she threw an ash tray at him after he had made an unfavorable remark about her. The accused then, according to this testimony, jumped from his seat and grabbed and choked her. The witness requested that he desist, which he did, but as he released her he stated that "some of these times I am going to kill her."

A witness testified that in October, 1948, the wife of the accused came to his house and requested that he go to the Newberry home and have Sam come after her. At that time both of her eyes were blackened and her face was bruised. This witness also stated that on January 6, 1949, during the early morning hours, the wife of the accused came to his home and requested that she be driven to Bland where she expected to take a taxicab to Bastian, Virginia. After driving her about five miles it appeared that there was a light on the porch of Thompson's store and she then requested that she be let out there. Thompson testified that when she entered his store she was upset and crying, so he drove her home and left her at the gate at about 1:30 o'clock in the morning.

There was medical testimony to the effect that the wife of the accused was living at the time she was decapitated.

The defendant did not testify in his behalf. The trial of the case began on April 25, 1949 and continued from day to day until Tuesday, May 3, 1949, at which time the jury returned its verdict.

There are thirty assignments of error. The first one is to the action of the court in ruling that the bill of particulars filed was sufficient. As previously stated, the indictment was of the short form provided by the statute. The bill of particulars, in paragraph "A", stated that Ralph and Samuel jointly murdered Mary Katheryn Newberry without excuse, provocation, palliation or alleviation, and that they were both guilty of murder in the first degree.

In paragraph "B" of the bill of particulars the accused was charged with having murdered his wife. Paragraph "C" stated that Samuel was guilty of the murder and that the accused aided and abetted therein. Paragraph "D" stated that Ralph was a principal in the first degree or second degree in committing the murder of the deceased. Paragraph "E" stated that the exact means and methods, including the weapons used, were not fully known at that time. Paragraph "G" stated that the deceased was beheaded and that

the head was burned in a stove in the dwelling house of the accused and his brother, Samuel. Paragraph "H" described the place on Big Walker mountain where the body was found, and paragraph "I" stated that on January 12, 1949, the accused made a written confession and that a copy of this confession was promptly turned over to his counsel.

We are convinced that the indictment, together with the bill of particulars, was sufficient to inform the accused of the crime for which he was to be tried. It would appear that the case of *Hevener* v. *Commonwealth*, 189 Va. 802, 813-814, 54 S. E. (2d) 893, is sufficient authority for our holding. This objection is without merit.

Objection was made to the introduction of certain photographs of the headless body of the deceased because at that time, as claimed by counsel for the accused, the *corpus delicti* had not been proven. We do not think there is any merit in this objection as the Commonwealth, through its attorney, was simply attempting to identify the headless body. The *corpus delicti* had been proven, for at the time they had the body of the deceased who had been beheaded. The body itself bore physical evidence of the fact that a cruel and gruesome murder had been committed, making it unnecessary for other proof, though there was other proof.

We think the photographs were properly admitted in the evidence. In *Martin* v. *Commonwealth*, 184 Va. 1009, 1022, 37 S. E. (2d) 43, we said: "Objects connected with crime are often offered in evidence in criminal cases when related to issues in the case. An authentic photograph shows no more than would be disclosed by a view of the object itself. It may give a more accurate description of the appearance, nature and condition of the object than a mere verbal description dependent upon memory. The picture of the wounded body of a man in the repose of death should excite no more sympathy or prejudice than the exhibition of a living person with a bruised, broken and torn body."

It was not error to admit evidence of the contents of the stove. The accused had said in his statement to the

officers that his brother Sam had shot the deceased in the head and killed her. The evidence for the Commonwealth was that she was not killed by being shot but was killed by decapitation. If there had been a bullet or molten lead found in the stove the statement of the accused would have been substantiated. On the other hand, the absence of this in the stove tended to support the theory of the Commonwealth that she was killed by the severance of her head. Bones and other parts of her head were found in the stove, and if a bullet had been lodged in her head it also would likely have been found there.

It has been assigned as error that the court permitted the Commonwealth to introduce evidence that had been illegally obtained. The accused had turned the body over to the sister and mother of the deceased for interment. He turned it over to them upon condition that it would not cost him anything to bury it. They transported the body to West Virginia and had it interred in a cemetery in Mercer county. Three months later the body was disinterred and carried to a funeral home in Princeton, West Virginia, where it was identified by the Wytheville undertaker who had transported it from Big Walker mountain to his funeral home. It was examined and X-rayed by Dr. Hale, a witness, who thoroughly qualified himself before he testified. He testified that upon taking X-ray pictures of the body and examining them closely, no bullet was found therein. Under the circumstances, we do not understand how the accused could make any valid claim that the testimony was illegally obtained. He had given up the body and any claim that he had thereto. This testimony was material because, as already stated, if a bullet had been found in her body it would have corroborated the statement which the accused gave the officers to the effect that the deceased had been killed by a bullet fired by Sam. Likewise, the absence of the bullet in the body would tend to corroborate the Commonwealth's theory that she was killed, not by a bullet, but by beheading. Dr. Hale testified in answer to

a hypothetical question, and he was not contradicted, that in his opinion the deceased was living at the time her head was severed. Other testimony in substantiation of that fact was the testimony of the funeral director in Wytheville, who stated that he was unable to get blood from the body and that when he embalmed the body no blood was forced out of the veins when the embalming fluid was pumped into them. This tended to indicate that the body lost all of its blood at the time of decapitation.

There are no facts in this record which will support the contention of the accused that the evidence was illegally obtained. If the sister and the mother of the deceased, to whom the accused had turned the body over, directed or consented to its exhumation, the testimony of the doctor could not be said to have been illegally obtained. There is no evidence in the record that in exhuming the body in West Virginia there was any illegality.

■ There was no error in admitting the written statement of the accused, given to Sergeant Helsabeck. It has been copied at length in the former portion of this opinion. The grounds of objection were that no sufficient foundation had been laid for the admission of the statement, and that the evidence "discloses the conditions and surroundings under which it was obtained render it inadmissible." This general objection, without pointing out specifically what was meant thereby, gave no direct information of why the objection was being made. This statement of the accused was voluntarily made and the evidence details the proper manner in which it was obtained. No bad faith or illegality on the part of the officers was shown. In fact, it was shown that they fully apprised the accused that the statement would be used against him. He had already remarked that he was "going down and tell the truth about this thing."

■ The Commonwealth's theory of the case from beginning to end was that the accused was either guilty of murder in the first degree or not guilty of any offense at all. This was the view of the learned judge of the trial

court, and the instructions to the jury were so framed. Accordingly, the court refused to grant instruction "K" offered by the accused. It was in this language: "The court instructs the jury that in Virginia the killing of a human being is presumed to be murder in the second degree, and the burden is upon the Commonwealth to elevate the offense to a higher dgree." That this might have been found by the jury to be a case of murder in the first degree is beyond doubt. The mode of the killing according to the evidence of the Commonwealth disclosed that it was done with extreme atrocity and cruelty. But we think the court should have granted instruction "K" for the burden was upon the Commonwealth to elevate the offense to murder in the first degree. Such an instruction is usually given in a homicide case and we do not think the present one is an exception.

The defendant did not testify but stood on his plea of not guilty. His statement to the officers was that he saw his brother kill the deceased and made no protest. It must be recalled that the Commonwealth offered uncontradicted evidence that the victim was alive at the time her head was severed. The evidence also shows clearly that her head was severed with a knife which belonged to the brother and which had a 6 or 7 inch blade. It was found in the bedroom of the brother. It had a stain on the blade. Other than the statement of the accused there is no evidence that the deceased had been shot. There was uncontradicted evidence surrounding the conduct of the accused. His statement as to the dates is in conflict with the statements of other witnesses. . He helped to place the headless body of his deceased wife in the truck and drove with the brother to dispose of it. They did dispose of the body on Big Walker mountain. It is inconceivable that the accused would stand by and witness his wife being shot by his brother and do nothing about it. In fact, he said that he did nothing about it because "it was his (Sam's) patient." He then stated that

he was not angry with his brother for the act he had committed.

■ It is a husband's duty to protect his wife, and in doing so he may take life in her defense. 26 Am. Jur., Homicide, sec. 158.

■ The accused had human blood on his trousers, but falsely claimed that it came from butchering a beef. He had upon one occasion a few months prior to the murder threatened to kill his wife, and she had been badly beaten on at least two occasions. Former threats made by an accused against the deceased are admissible as evidence upon the question of whether the accused in fact committed the homicide because they tend to show an intention on his part to do it and therefore a probability that he did it. 26 Am. Jur., Homicide, sec. 358.

We do not think the court committed error in overruling the defendant's motion in arrest of judgment. Counsel on both sides had argued defendant's motion to set aside the verdict in the court at Bland. The judge of the court took the motion under advisement and after mature consideration decided to overrule it, and from his chambers in Tazewell, Virginia, he notified counsel by letter of his decision. The defendant was not present at the time the court sent out its letter of notification, but on October 4, 1949, at Bland, Virginia, in the presence of the defendant, the trial court informed counsel that he had overruled the motion to set aside the verdict, and he forthwith pronounced sentence upon the defendant and entered final judgment.

■ We do not think the defendant was entitled to be present in Tazewell at the time the court concluded to overrule the motion. When the final judgment was entered against him on October 4 he was present.

There are numerous other assignments of error challenging instructions that were given, and the ruling of the court in refusing certain of those offered by the accused. We have considered all of these assignments and do not find any merit in them.

Counsel for the accused relied upon the cases of *Holland* v. *Commonwealth*, 190 Va. 32, 55 S. E. (2d) 437; *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273, and *Garner* v. *Commonwealth*, 186 Va. 600, 43 S. E. (2d) 911. These cases are distinguishable from the case at bar. In the *Holland Case* the evidence did not place the accused at the scene of the crime. In the *Garner Case* the evidence by which it was sought to place the accused at the scene of the crime was held incredible. And in the *Smith Case* it was held that Mrs. Smith could not have placed the body of the deceased where it was found without material aid from another, and the evidence did not sufficiently show that another person assisted her in doing so, or that she assisted him.

Another serious error assigned is that to the action of the court in refusing to admit in evidence the written confession of the brother, Sam, to the effect that he alone murdered the deceased, and also to the refusal of the court to admit the testimony of Mrs. Hattie Price, the wife of the sheriff, and Mrs. Edith Combs, who offered to testify and did testify out of the presence of the jury, to the effect that on the night of January 10, 1949, after Samuel Newberry had been incarcerated in jail at Bland, in response to a request made by Samuel Newberry, Mrs. Price supplied him with a cigarette, at which time Mrs. Combs was also present. He said to Mrs. Price at that time, "Mrs. Price, I guess I have committed the worst crime that has ever been committed in the county. I killed that woman and I'm not sorry for it."

The court refused to admit in evidence the written confession made by Samuel and signed by him, and also refused the testimony of Mrs. Hattie Price and Mrs. Edith Combs. The refusal in both instances was based upon the ground that it was hearsay and that Samuel Newberry was then in jail at Bland, where the trial was being held, and available as a witness. Counsel for the accused then requested the court to have Samuel brought into court and sworn as a witness. This was done, and when he took the witness stand

he refused to testify, claiming his immunity on the grounds that he was jointly indicted with the accused for the murder of the deceased. The court then told him to stand aside, and had him returned to jail. After this, counsel for the accused again offered the written confession of Samuel Newberry, in which he completely exonerated the accused, and also the testimony of Mrs. Price and Mrs. Combs referred to. Again the court refused to admit the confession or the testimony.

 *Hines* v. *Commonwealth*, 136 Va. 728, 117 S. E. 843, 35 A. L. R. 431, is relied upon by the accused as authority for the admissibility of the confession and the testimony referred to. It was pointed out in that case that the authorities are almost unanimous in holding that confessions of third parties made out of court are not admissible as tending to exonerate the accused because to admit them would violate the rule against hearsay. Under the peculiar facts and circumstances in that case this court held that a bare confession by a deceased or unavailable witness ought to go to the jury for what they might consider it worth, but inasmuch as that holding was out of line with the current of authority the court indicated that it would expressly limit its effect as a precedent to the particular facts in that case.

 It is also there stated that hearsay evidence is generally excluded because it lacks the sanction of an oath and the test of cross-examination, and is favorable for use as perjured evidence; that the truth of the confession itself and the credibility of the witness or witnesses who undertake to repeat it is addressed to the discretion of the jury; and that where the declarant has since died or otherwise become unavailable as a witness such admissions are receivable in evidence upon the ground that the evidence itself is important to the ends of justice and the element of self-interest affords a reasonably safe substitute for the oath and cross-examination as a guarantee of truth.

In speaking of the refusal of a third party, who has made a confession, to testify, because it would tend to incriminate

him, this was said: "If it be suggested that a third party making a confession out of court could not be compelled to testify because it would tend to incriminate him, the answer seems easy enough. If he were dead or out of the jurisdiction, the question of privilege would not arise; if he were alive and present and claimed his privilege, he would not be available as a witness, and the exception would apply with as much reason as if he were dead or absent." 136 Va. 744-5.

It would seem that one who refused to testify because his testimony might incriminate him is considered unavailable as a witness, just as though he were beyond the reaches of the Commonwealth, or had since died. If he is unavailable as a witness his confession may be used. See *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509.

We are of opinion that the written confession of Samuel Newberry, and the testimony of Mrs. Price and Mrs. Combs should have been given the jury for what they might have been worth, its credibility and weight being left to the jury. If the jury believed this evidence it might have produced a different result. In any event, under the facts and circumstances of this case, we think it was admissible, and the failure of the court to admit it was reversible error.

The first verdict of the jury finding the accused guilty of murder in the second degree, was not accepted by the court, though it was good in form. In refusing to grant instruction "K" and to accept that verdict the court was in error. It should have been accepted and would have been permitted under instruction "K" had it been granted.

The judgment is accordingly reversed, the verdict set aside, and the case remanded for a new trial, in accordance with the views expressed in this opinion. The accused should not now be tried for a higher offense than murder in the second degree, he having been acquitted of murder in the first degree by the first verdict of the jury which the court erroneously refused to accept.

*Reversed and remanded.*