307 So.2d 473 (1975)
Freddie Lee PITTS and Wilbert Lee, Appellants,
v.
STATE of Florida, Appellee.
Nos. T-146 and T-147.
District Court of Appeal of Florida, First District.
February 3, 1975.
*475 Phillip A. Hubbart, Irwin J. Block, Miami, Maurice Rosen, N. Miami Beach, Jack Greenberg, Michael Meltsner, and James A. Nabrit, III, New York City, for appellants.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., for appellee.
BOYER, Judge.
Appellants, who were convicted by a jury of murder in the first degree, here urge twelve separate points for reversal based upon 39 assignments of error relating to a record on appeal consisting of 22 volumes exclusive of depositions and exhibits, and comprising 4,436 pages.
This case has a long history. During the night of July 31, 1963, the Mo-Jo Gas Station in Port St. Joe, Florida, was robbed and the two attendants, Jesse Burkett and Grover Floyd, were abducted and killed. On August 15, 1963, appellants were indicted by the Gulf County Grand Jury on the charges of murdering the gas station attendants. On August 28, 1963, the trial judge sentenced them to death on their tendered pleas of guilty. The Supreme Court of Florida affirmed. (Lee v. State, Sup.Ct.Fla. 1964, 166 So.2d 131)
The first post-conviction collateral attack against said convictions was denied by the trial judge and affirmed on appeal. (Lee v. State, Fla.App. 1st 1966, 188 So.2d 872, cert. den., 386 U.S. 983, 87 S.Ct. 1292, 18 L.Ed.2d 234 (1967))
A second post-conviction collateral attack against those convictions was granted in the lower court, reversed on appeal to this Court (State v. Pitts, Fla.App. 1st 1970, 241 So.2d 399) and again reversed by the Florida Supreme Court on confession of error by the State (Pitts v. State, Sup.Ct.Fla. 1971, 247 So.2d 53). On remand a new trial was ordered by this Court. (State v. Pitts, Fla.App. 1st 1971, 249 So.2d 47)
On September 15, 1971, the trial court dismissed the original 1963 grand jury indictments against appellants on the ground that they had been indicted by a grand jury from which members of the black race had been systematically excluded.
On October 20, 1971, the Gulf County Grand Jury reindicted appellants on the original first degree murder charges. On December 15, 1971, the trial court dismissed *476 said indictments on the ground that the grand jury was illegally constituted (one of the jurors had previously been convicted of a felony and had not been restored to his civil rights) and transferred the venue to Jackson County, Florida.
On January 4, 1972, the Jackson County Grand Jury indicted the defendants on the original first degree murder charges. The appellants entered pleas of not guilty and the case proceeded to trial, resulting in verdicts of guilty as charged. On March 15, 1972, the trial court sentenced appellants to death, which sentences were subsequently changed to life imprisonment. (See In re Baker, Sup.Ct.Fla. 1972, 267 So.2d 331)
Timely motion for new trial was denied and this appeal followed.
Appellants claim in their first point that the verdicts rendered by the jury are contrary to the manifest weight of the evidence, urging reversal and discharge of appellants. Nothing will be here accomplished by summarizing the 4,436 pages of the record on appeal. Suffice to say that our examination reveals ample credible evidence to support the jury's verdicts. We therefore find appellants' first point to be without merit.
Appellants next urge that one of the members of the petit jury was not a duly qualified elector of the county as required by F.S. 40.01(1), thereby invalidating the verdict returned by the jury. Appellants make no claim of any prejudice and no assertion that the impartiality of the jury was in any manner affected. The facts, as related to this point, are remarkably similar to those in Leach v. State, Sup.Ct.Fla. 1961, 132 So.2d 329. Relying on that case, we find appellants' second point to be without merit. In the Leach case our Supreme Court said:
"* * * For example, if after the trial it should develop that a juror was closely related by blood to deceased and had announced his conviction regarding the guilt of the accused and had misrepresented his position when examined, such a disqualification would enter into the very fundamentals of the trial itself. This is not so with reference to the failure of the juror to be a registered voter. The appellants make no contention that they were not fairly heard with an unprejudiced mind by the jurors in question. Their position offers no ground for reversal. Ex parte Sullivan, 155 Fla. 111, 19 So.2d 611; Burns v. State, 89 Fla. 353, 104 So. 447; Section 913.04, Florida Statutes, F.S.A.; 31 Am.Jur. `Jury' Sections 154-156." (132 So.3d at page 333) (See also Slaughter v. State, Sup.Ct.Fla. 1974, 301 So.2d 762)
We next consider appellants' attack upon the jury selection system employed in Jackson County. It is appellants' contention that the jury selection process there utilized violated the principles announced in State v. Silva, Sup.Ct.Fla. 1972, 259 So.2d 153, because the process "arbitrarily" discriminated by exclusion of black persons. However, an examination of the testimony of two of the jury commissioners who were called as witnesses by appellants reveals that the method or system utilized was very similar to that employed in Duval County and approved by us in Mahoney v. State, Fla.App. 1st 1974, 300 So.2d 743, except that in Duval County the names are "pulled" by a computer whereas in Jackson County the work is performed manually. We find that there was sufficient evidence to sustain the trial judge in denying appellants' motion to dismiss the indictments on the ground that members of the black race were systematically excluded, and that the method or system employed was not subject to valid constitutional attack.
Appellants further urge that, based upon statistics, the grand jury which indicted appellants was unconstitutionally composed in that blacks were systematically excluded from the list from which it was drawn. In so urging they rely primarily upon Alexander v. Louisiana, 405 U.S. 625, *477 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). In that case the court held that a conviction based upon an indictment returned by an all white jury will be reversed when two factors are present: (1) when a statistical record shows a gross disparity between those blacks eligible to serve and those who actually served and (2) there is employed a system of selection which presents an opportunity for discrimination. There the statistical evidence revealed that in Lafayette Parish, Louisiana the black population of all adults was 21.06 percent (7,373 of 44,986) and that of the 400 persons ultimately selected as prospective grand jurors, only 27 (6.75%) were black and only one (5%) of the twenty persons drawn from the grand jury venire was black, and no black actually served. That which afforded the opportunity for discrimination in Alexander v. Louisiana, supra, was a questionnaire mailed to prospective jurors which, when returned, indicated the race of the individual. Similar practices were found in Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) where different colored cards indicated the race of the person whose names appeared thereon. In Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) a letter was employed after the name of the prospective juror to indicate his or her race.
When we compare the facts in the case sub judice to those appearing in Alexander v. Louisiana, supra, we find that the population of Jackson County voters when the master list was prepared was 11,826 whites and 3,101 blacks or approximately 21 percent. The list reflected a composition of 322 whites and 62 blacks which is 16.1% blacks. Thus, there does not appear the "gross disparity" sub judice as was condemned in the Alexander case. Further, the record clearly reflects that no practice was employed at the time the instant grand jury was selected or impaneled to designate the race or color of the prospective jurors. It appears therefore that race was not reflected in the selection processes employed in Jackson County at the times relevant to this case and that accordingly composition of the grand jury which indicted appellants does not fail the tests of Alexander v. Louisiana, supra.
We next consider the applicability of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), cited by appellants, and find that they can take no solace there. Indeed, the case tends very strongly to support the State in the case sub judice. In the Swain case, a Negro convicted of rape by an all white jury in the Circuit Court of Talladega County, Alabama, appealed from his conviction, asserting that he was denied equal protection of the laws by discriminatory jury selection in three respects: (1) discrimination in the selection of venires, demonstrated by the fact that while 26 percent of the persons eligible for jury duty were Negroes, the venires contained only 10 to 15 percent Negroes; (2) discrimination in the selection of jurors from the veniremen, demonstrated by the facts that the prosecutor used his peremptory strikes to remove all Negro veniremen; and (3) discrimination in the use of the peremptory strike system in Talladega County through the years, perverting its purpose in a scheme to exclude all Negroes from ever serving on petit juries there by the prosecutors striking all Negro veniremen, demonstrated by the fact that no Negro had ever served on a petit jury in Talladega County. The Alabama Supreme Court affirmed the conviction. On certiorari the Supreme Court of the United States affirmed. In an opinion written by Justice White, expressing the views of five members of the court (a majority) it was held that: (1) an accused is not constitutionally entitled to a proportionate number of his race on the jury which tries him, and the under-representation of his race by 10% does not show purposeful discrimination; (2) in a particular case, a prosecutor may constitutionally use his peremptory strikes to eliminate all of the accused's race from the jury; and (3) the fact that no Negroes had ever served on a *478 petit jury in Talladega County did not show a perversion of a peremptory strike system by the prosecution where the record failed to show when, how often, and under what circumstances the prosecutor alone had been responsible for striking Negro veniremen.
In the case sub judice the State Attorney exercised 14 peremptory challenges to strike from the petit jury every prospective Negro juror who survived a challenge for cause. The result was that the defendants were tried by an all white jury. Appellants, citing Swain v. Alabama, supra, as authority, urge that such use of the State's peremptory challenges constitutes a systematic exclusion of Negroes from the jury panel and therefore makes out a prima facie case of racial discrimination in the selection of the petit jury when such exclusion has been a long standing practice. Seeking to substantiate that contention the appellants filed a post-trial motion for discovery seeking the disclosure of records from the State Attorney to establish such a long standing practice of racial discrimination, claiming that such records could not be obtained elsewhere. The lower court denied the motion and thereby, appellants contend, precluded appellants from making the necessary prima facie showing under the Swain doctrine.
We find no fault with the trial court's denial of the post-trial motion for discovery. First, the filing of such motion after conclusion of the trial was simply too late. Second, appellants failed to demonstrate here, and so failed in the court below, why such information so sought to be obtained was not as readily available to them as to the State. Certainly court files of prior criminal proceedings in Jackson County are a matter of public record and any information regarding veniremen in prior cases, their identity and race and the identification of the party challenging them was as available to appellants as to the State. There has been no showing that the State secreted any such information or withheld it from appellants nor, indeed, that any such information was even available to the State, except as might be a matter of public record appearing in the files of the many cases which had theretofore been tried in Jackson County, Florida. Under such circumstances the trial judge was eminently correct in denying appellants' post-trial motion for discovery. (See Dykman v. State, Sup.Ct.Fla. 1974, 294 So.2d 633)
We next consider appellants' claim that their right to a fair trial was denied because they were tried in Jackson County, Florida, where prejudicial pretrial news publicity had so saturated the community for many years prominently featuring the defendants' confessions and pleas of guilty to the crimes charged that the defendants could not obtain a fair and impartial trial in that county.
Venue was originally in Gulf County in the Fourteenth Judicial Circuit. Upon appellants' motion for change of venue an order was entered transferring venue to Jackson County which is also in the Fourteenth Judicial Circuit. The appellants thereupon filed a motion for change of venue from Jackson County and which stated that the defendants could not obtain a fair trial in that county. A hearing was held on the motion and the trial judge reserved his ruling. Selection of the petit jury commenced on February 1, 1972, and continued for 12 days thereafter. Two hundred twenty-six jurors were called during the jury selection, 64 of whom were excused at the outset because of their opposition to capital punishment. Eleven were excused for miscellaneous other causes. Of the remaining 151 who were asked on their voir dire concerning the pretrial publicity of the case, nearly all stated that they knew about the case from the pretrial news publicity and general conversation in the community. Seventy-four of that 151 were excused because they had fixed opinions about the guilt or innocence of appellants or were extremely familiar with the facts of the case from the news publicity. Many of those excused indicated that they *479 could not give appellants the benefit of the presumption of innocence. During the voir dire examination the appellants renewed their motion for change of venue on a daily basis, submitting additional newspaper exhibits. After appellants exhausted all of their 40 peremptory challenges the trial judge denied the motion for change of venue. It is appellants' position that that denial constitutes reversible error.
In a factually similar case, our sister court of the Second District, in an opinion written by Associate Judge Ben F. Overton, now a member of the Supreme Court of Florida, Kelley v. State, Fla.App.2d 1968, 212 So.2d 27, said:
"Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom. Singer v. State (Fla. 1959) 109 So.2d 7; Collins v. State (Fla.App. 1967) 197 So.2d 574 and cases cited therein." (212 So.2d at page 28)
In a case so remarkably similar, involving the same point, that we feel justified in quoting extensively, our sister court of the Third District said:[1]
"To begin with, we will discuss the facts relating to Gavin's first point. The defendant filed on February 19, 1971, a pretrial motion for a change of venue under Rule 3.240, CrPR, 33 F.S.A. on grounds of excessive pretrial publicity prejudicial to defendant, thereby allegedly precluding an impartial trial in Dade County, Florida. Attached as exhibits to that motion were about sixty clippings from The Miami Herald, which is the morning paper of county-wide distribution, and The Miami News, the evening paper of county-wide circulation. The clippings, spanning two years, discuss the wide-spread hunt for Gavin as the murderer of a Miami Police Officer, his capture after a gun battle in Tennessee, his escape by holding two Miami Police Officers as hostages, and subsequent recapture. The articles frequently mention that Gavin had pleaded guilty to the murder of the police officer and was sentenced to the electric chair. The testestimony of the veniremen also revealed that there was television coverage of the manhunt for the defendant and that radio news items concerning the defendant were also heard by certain prospective jurors.
"This pretrial motion for change of venue was denied. The defendant urged this denial as a ground for his motion for new trial under Rule 3.600, CrPR, and assigned this as error on the constitutional grounds herein presented.
"The defendant has summarized the results of the selection of the jury panel from a venire of forty-three men and women, without contradiction by the state. Of the forty-three veniremen, thirty-eight were examined individually and five were excused by the state exercising peremptory challenges before such voir dire. Of those thirty-eight, twenty-nine stated that they had seen and read pretrial newspaper and/or television publicity concerning defendant, and knew him by name before coming to court. Two had not seen or read such news and had never before heard of him. Defendant exhausted his twenty peremptory challenges, and the state exercised ten.
"During voir dire, on February 24, 1971, defendant renewed his motion for change of venue and inserted in the record a February 23, 1971, Miami News Article and a February 24, 1971 Miami *480 Herald Article. Both items related that defendant in open court, but out of the presence of the venire: threatened his counsel with physical violence, walked into court with a lead pipe, stated he would commit perjury to gain an acquittal, and would tear the court apart. Only the first and third matters are supported in the record, and apparently Gavin had walked into the courtroom with some object (but not a lead pipe).
"Leonard E. Curney, who served on the jury read the latest Herald article and stated that he had formed the opinion that Gavin was guilty of committing the acts in the courtroom outside the jury's presence the previous day. He stated that he did not know why that opinion should influence his opinion in the case to be tried, that his expressed opinion on the courtroom conduct would `not necessarily' affect his determination in the case, and that he `will try' to `set aside that publicity' he has read. We have read, but do not need to reproduce here, the relevant questions and answers concerning the veniremen's statements that they would fairly try the case solely on the evidence presented at trial.
"Prospective juror Eva Buck testified that she had read `all the newspaper articles' relating to Gavin. We have read, but do not need to reproduce here, the pertinent questions and answers relating to whether she had formed an opinion of guilt or innocence as to the charge of murdering the police officer. Defendant moved that she be excused for cause, and upon motion being denied, defendant exercised a peremptory challenge.
"A defense motion for change of venue was later made and denied. A defense motion to sequester the jury was also later made and denied.
"Appellant has not contended that the news items were inaccurate or slanted, but he has urged that their excessiveness precluded a fair trial. The news items in the record are virtually all straight news items reporting the facts, and those items which might be characterized as editorials do not resemble in the least those in the Sam Sheppard trial. Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.
"The decisive issue is whether or not the jury could base the verdict which they returned upon the evidence presented in court. A subordinate issue in this case is whether or not a great deal of straight news items about the defendant requires a change of venue. Two factors need to be considered in the resolution of this narrower question: first, the news items in the record reported criminal activities which were not the subject of the prosecution sub judice, but second, they reported other non-criminal activities which the defendant actually said or did and which were newsworthy.
"An impartial jury is not required to `totally ignorant of the facts and issues involved' and may `have formed some impression or opinion as to the merits of the case ... particulary ... in criminal cases.' Irvin v. Dowd (1960), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751. Therefore, the existence of widespread publicity does not by the very fact itself compel the granting of a motion for a change of venue.
"The law focuses upon the impartiality of the jury and vests in the judicial discretion of the trial court initial determination of a motion for change of venue for alleged absence of impartiality. Therefore, a reviewing court will not upset the trial judge unless his abuse of discretion is manifest. See: Sheppard v. Maxwell, supra." (259 So.2d at pages 545-547) As the citation reveals, the Supreme Court of Florida denied certiorari *481 in the Gavin case (Gavin v. State, Sup. Ct.Fla. 1972, 265 So.2d 370).
Adopting the rationale of the two last mentioned cases, and the cases and authorities therein cited, we conclude that the trial judge did not err in denying the motion for a change of venue from Jackson County.
We earlier alluded to the affidavits which were attached to the motion for change of venue. Although we have already concluded that the denial of the motion does not constitute error, we feel that the 600 affidavits which were entered into evidence during the hearings on the motion merit additional comment.
The affidavits are identical, being on a form which was reproduced by some photographic or mechanical means. The wording thereof is as follows:
AFFIDAVIT
 STATE OF FLORIDA |
 >
 COUNTY OF JACKSON |
Before me, the undersigned authority, personally appeared _________ who being first duly sworn, did depose and day:
1. He/she is a resident of Jackson County, Florida.
2. He/she is acquainted with the case now in Court in Jackson County against Freddie Lee Pitts and Wilbert Lee, charging them with Murder in the First Degree.
3. This case has received considerable publicity in the newspapers, television and radio and has been widely discussed in this area. An atmosphere of passion and prejudice exists against Freddie Lee Pitts and Wilbert Lee in this area.
4. He/she is of the opinion that the people of this County are unduly biased and prejudiced against Freddie Lee Pitts and Wilbert Lee and that they cannot secure a fair and impartial trial in Jackson County.
 ______________________________
Sworn to and subscribed before
me this ____ day of ______
1972.
_______________________________
Notary Public, State of Florida
at Large
My Commission Expires:
On some of the affidavits the gender of the affiant is indicated by the deletion of one of the pronouns. Most of the affidavits are notarized by the same notary public. It is interesting to note that on some of the affidavits the notary public's signature is in carbon, indicating that numerous of the affidavits were "notarized" by placing carbon paper between forms; the notary signing only the top form. On some of the affidavits the space provided in the second line for insertion of the name of the affiant is blank. Some of the affidavits are signed with an X mark without witnesses. Some bear the notary's seal but no signature. Others are signed by the notary and sealed, bearing the date of the expiration of the notarial commission but are not signed by any affiant nor anyone else. (The conduct of the notary not being an issue in this case sub judice, the record is silent as to whether appropriate action has been instituted in that regard.) Most, if not all, of the "affidavits" which bear any date at all are dated the 18th, 19th and 20th of January of 1972.
It occurs to us that the above observations relative to the "affidavits" may well have been found by the trial judge to have been indicative of the weight and credibility to be accorded to them.
Appellants next urge as ground for reversal that statements made by the prosecuting attorney during summation before the jury were so inflammatory as to *482 deprive appellants of a fair trial. First, we observe that the statements complained of were nothing more than fair response to statements made by appellants' attorneys during summation. Defense counsel may not make statements during summation which reasonably invite response and then complain when his opponent's response is such as would be reasonably expected to be elicited by defense counsel's own prior remarks. (Frazier v. State, Fla.App. 1st 1974, 294 So.2d 691)
It is well settled that counsel is accorded a wide latitude in making argument to the jury. (Lovell v. Henry, Fla. App. 3rd 1968, 212 So.2d 67; Frazier v. State, supra) jury arguments will not be considered grounds for mistrial nor reversal unless they are highly prejudicial and inflammatory. (H.I. Holding Company v. Dade County, Fla.App. 3rd 1961, 129 So.2d 693) Sub judice we do not find the prosecutor's statements to have been such as to inflame the jury nor to have prejudiced the rights of appellants.
We next consider the refusal of the trial judge, ruling on timely objections, to permit various persons to testify as to alleged oral confessions by a third party, one Curtis Adams, Jr., of the crimes for which appellants were on trial, and the court's sustention of timely objections to the introduction into evidence of a recording of one of such alleged confessions.
Warren D. Holmes, formerly of the Miami Police Department, who identified himself as "a lie detector expert" was called as a witness for the appellants. He testified that, pursuant to court appointment, he conducted a polygraph examination of Curtis Adams, Jr. in the Broward County Jail on December 21, 1966. A recording of the questions propounded by Mr. Holmes and the answers given by Adams were proffered into evidence out of the presence of the jury but the State's objection thereto was sustained, as was the objection to Mr. Holmes testifying as to what was told to him, by way of alleged confession, by Adams.
Elihu Phares, a Broward County Deputy Sheriff, was also called by appellants and sought to be interrogated as to an alleged oral confession made to him by Adams. The trial judge sustained an objection thereto on the ground of hearsay.
Mrs. Mary Jean Akins Smith, nicknamed "Billie", Adams' girlfriend, also sought to testify at the behest of appellants, that Adams had told her in detail the events surrounding his alleged robbery of the Mo-Jo Service Station and the killing of the attendants, being the crimes for which appellants were on trial. That testimony too, though proffered, was rejected on the ground of hearsay.
Curtis Adams, Jr. was called by appellants as a court witness. He was accompanied by his personal attorney, whose request for immunity on behalf of his client was refused by the State. The first question asked of Adams was his name, to which he replied "Curtis Adams, Jr.". Thereafter the following questions were each asked of him, in the presence of the jury, to each of which he responded "I refuse to answer on the ground that it might tend to incriminate me".
"Q. Mr. Adams, did you rob and kill Jessie Burkett and Grover Floyd, Jr.?
"Q. Mr. Adams, were you living in Port St. Joe on July thirty first, 1963?
"Q. Mr. Adams, on the morning of August one, 1963, did you go to the Mojo station?
"Q. Mr. Adams, on the early morning of August 1, 1963, did you have a twenty-five automatic pistol with you?
"Q. Did you use a twenty-five automatic pistol in holding up Jessie Burkett and Grover Floyd, Jr.?
"Q. Did you require Jessie Burkett to remove a thirty-eight caliber revolver during the robbery and hand it to you?

*483 "Q. Did you, sir, take Jessie Burkett and Grover Floyd, Jr. from the Mojo station and on the early morning hours of August 1, 1963?
"Q. Did you, sir, rob the Mojo station of approximately one hundred dollars on the early morning hours of August 1, 1963?
"Q. Did you take Jessie Burkett and Grover Floyd, Jr. in Mary Jean Akins' car to a wooded area near a canal in Gulf County on the early morning hours of August 1, 1963?
"Q. Did you tell Jessie Burkett and Grover Floyd that you were only going to tie them up so that you could get away?
"Q. Did you, sir, shoot and kill Grover Floyd, Jr. and Jessie Burkett when they lay down for you to tie their hands up?
"Q. Did you, sir, leave Port St. Joe on the morning of August 1, 1963?
"Q. Were you living with Mary Jean Akins at that time?
"Q. Were you in Broward County, Florida, on August 16, 1963?
"Q. Did you during the early morning or late night hours of August 16, 1963, rob and kill Floyd McFarlin, an attendant at an all night gas station in Broward County, Florida?
"Q. Did you, sir, take Floyd McFarlin from the all night gas station in Broward County, Florida, to a wooded area near a canal on the early morning hours of August 16, 1963?
"Q. Did you, sir, at or near the canal shoot and kill Floyd McFarlin by shooting him in the head?
"Q. Did you, sir, tell Mary Jean Akins what you had done with Grover Floyd, Jr. and Jessie Burkett with reference to robbery-murder of a Mojo station?
"Q. Did you, sir, while you were in prison 
"Q. Mr. Adams, while you were in Raiford Prison, did you you admit to any cellmate that you had killed Jessie Burkett and Grover Floyd, Jr.?
"Q. Did you, sir, admit on any  admit to any authority in Broward County, Florida, that you had killed Jessie Burkett and Grover Floyd, Jr.?
"Q. Did you, sir, while in Broward County, Florida, give a tape recorded statement with reference to the murder of Jessie Burkett and Grover Floyd, Jr. to Warren Holmes?"
It was after the propounding of the above quoted questions that the appellants sought to introduce a recording of the alleged confession which, though proffered and received as such, was rejected as evidence before the jury.
Appellants contend that Adams' statements to Holmes, Phares and Smith and the recording of his polygraph examination are all admissible as declarations against penal interest and under the doctrine of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The State urges that appellants' reliance upon Chambers v. Mississippi is misplaced, that the declaration against penal interest rule is inapplicable and has no foundation in the jurisprudence of this state, and that the excluded statements were rank hearsay.
The State is correct. The law is so well settled as to require no citations of authority that hearsay, unless it falls within one of several recognized exceptions, is not admissible into evidence. All of the statements made to others by Curtis Adams, Jr., which were proffered, but not admitted into evidence, were clearly hearsay and fell into none of the recognized exceptions to the rule. The fact that one of the statements (the polygraph examination) was recorded does not change its hearsay character.
It has been urged that one of the more significant exceptions to the hearsay rule renders admissible in evidence relevant *484 declarations against interest by a non-party where the declarant is unavailable as a witness. The underlying theory of the exception is that the necessity of the occasion renders the reception of such evidence advisable and that the reliability of such declaration is generally to be depended upon, since a person does not ordinarily assert facts which are against his own interest. (Filesi v. United States, 352 F.2d 339, 4th Cir.1965) The two vital elements of this exception to the hearsay rule are the unavailability of the witness and the nature of the interest involved. Traditionally, unavailability meant that the declarant had died. (Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913)) Some states have expanded the concept of unavailability to include illness, insanity, absence from the jurisdiction and incompetency through interest. (Straughan v. Asher, Mo. App., 372 S.W.2d 489 (1963)) The law in other jurisdictions is uncertain as to whether a witness is unavailable where he invokes his constitutional right against self incrimination and refuses to testify. Courts in California, New York and Virginia have held that a declarant is unavailable where he invokes his constitutional right against self incrimination. (People v. Spriggs, 60 Cal.2d 868, 36 Cal. Rptr. 841, 389 P.2d 377 (1964); People v. Brown, 26 N.Y.2d 88, 308 N.Y.S.2d 825, 257 N.E.2d 16 (1970); Newberry v. Commonwealth, 191 Va. 445, 61 S.E.2d 318 (1950)) Other courts, probably expressing the majority view, have held otherwise. (State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713 (1947); Kellam v. State, 36 Ala.App. 332, 55 So.2d 517 (1951))
The other element of the declaration against interest exception to the hearsay rule involves the nature of the interest. For many years, the general rule has been that to be admissible, the declaration must be against either the pecuniary or proprietary interests of the declarant. (Donnelly v. United States, supra) The Supreme Court of the United States expressly rejected in the Donnelly case the contention that a declaration against penal interest should be admissible. However, although still the minority rule, there does appear to be a trend toward the admission of declarations against penal interest.
Counsel has failed to call to our attention any definitive opinion from either the Florida Supreme Court or any of the District Courts of Appeal either recognizing or rejecting the declaration against penal interests doctrine as an exception to the hearsay rule, and our independent research has failed to reveal any. None of the views expressed in the above cited cases from other jurisdictions are satisfactory to us. Although, under the majority view, unavailability of the declarant is a requisite to the admissibility it appears to us that the exact opposite is more reasonable. It simply does not comport with reason, logic nor recognized principles of jurisprudence to hold that an alleged confession by one now deceased or safely beyond the borders of this country and not subject to extradition (thereby unavailable and safe from prosecution) or one who is unavailable by reason of asserting his constitutional rights against self incrimination, may be introduced into evidence at the trial of an accused, thereby depriving the people (State) of the traditional right of cross-examination and observation in the presence of the trier of the facts, the jury.
In any event, were alleged declarations against penal interest to be considered as an exception to the hearsay rule it would be imperative that broad discretion be afforded the trial judge in determining reliability of the declaration and the declarant by consideration of such factors as spontaneity, relationship between the accused and the declarant, existence of corroborative evidence whether or not the declaration had been subsequently repudiated and whether or not the declaration was in fact against the penal interests of the declarant. As an example, an "admission" *485 by one who had already admitted or been convicted of other similar crimes could hardly be said to be against his penal interests.
Finally, in relation to this particular point, we hold that declarations against penal interests are not recognized in Florida as an exception to the hearsay rule: Further, even were such doctrine so recognized, the trial judge correctly held it inapplicable under the circumstances of the case sub judice.
That is not to say that Adams himself could not have properly taken the stand and confessed before the jury the crimes for which appellants were on trial, but this he chose not to do, asserting his constitutional right against self incrimination. It is, we think, relevant to here observe that although Adams refused to answer the several questions propounded to him on the ground of self incrimination, the jury did in fact have the benefit of appellants' contention that Adams had confessed, inasmuch as appellants' counsel was permitted to ask him the questions hereinabove quoted, all in the presence of the jury, notwithstanding that the questions went unanswered, but also undenied.
Chambers v. Mississippi, supra, is not precedent for appellants' position. There, in a murder prosecution, the defendant called a witness for the purpose of introducing that witness' written confession of the crime, but on cross-examination by the State the witness repudiated the confession and asserted an alibi. The defendant was thereupon prohibited from cross-examining the witness as an adverse witness with regard to the circumstances of his repudiation and his alibi and with regard to other oral confessions allegedly made by the witness, all on the basis of the rule that a party may not impeach his own witness. The Supreme Court there held that the application of the state rules of evidence to preclude the defendant from cross-examining the witness who had first confessed and then had repudiated his confession, and from introducing the hearsay testimony concerning the witness' oral confessions violated defendant's due process right to a fair trial, including the right to confront and cross-examine adverse witnesses and to present witnesses in his own behalf. On the other hand, in the case sub judice, Adams was called as a court witness with the right of any party to impeach or cross-examine had he testified. He gave no testimony damaging to appellants and in fact refused to answer any material questions on the ground of self incrimination. Had Adams elected to testify then clearly appellants would have had the constitutional right to cross-examine and impeach by prior statements, as was the holding in Chambers v. Mississippi: But such are not the facts here.
Further, in Chambers v. Mississippi, the court recognized that admission of the third party confessions should depend upon the degree of reliability of that testimony, indicating three factors to be considered: The spontaneity of time within which the confession was made and the relationship to the crime, the existence of corroborative evidence other than the statements themselves, and the presence or absence of the third party confessor and whether he is subject to cross-examination by the state. In Chambers, the third party's confession was made immediately after the crime was committed, there was tangible evidence supporting the admission of guilt and he was present when testifying, thereby being available for cross-examination by the state. Sub judice the opposite existed. Adams' confession was long after the crime was committed there was no tangible evidence independently corroborating his admission and although he was physically present, his invocation of his right against self incrimination rendered him completely unavailable for cross-examination; indeed, as a witness at all.
Our holding here is in accord with the holding under similar circumstances of our sister court of the Third District in Dykman v. State, Fla.App. 3rd 1974, 300 So.2d 695, *486 wherein the appellant sought to rely upon Chambers v. Mississippi, supra. There the court said:
"* * * In the instant case the hearsay evidence sought to be admitted was the statement of a third person, who was not present at the trial, allegedly made to the police officer during his investigation of the crime. If we proceed upon the principle that the basis for the exclusion of hearsay in a trial is the absence of the oath of the person making the statement and the absence of the opposing party's right to cross-examine as to the truth of the statement, then these absences are not matters which the defendant seeking to introduce the statement may waive. The holding in Chambers v. Mississippi appear to be; `In these circumstances, where constitutional rights directly effecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.' We accept this rule as a salutory development in criminal law. In the application of such a rule, it must be pointed out that the Supreme Court in setting forth `these circumstances' said, `The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability.' The statements referred to were confessions and were found to have been made spontaneously. Also, they were found to be corroborated by other evidence and by the sheer number of independent confessions. And finally, they were found to fall within the bounds of `penal-interest rationale.' The court further found:
`Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.'
"We find no such circumstances to justify the hearsay evidence offered in this case." (300 So.2d at page 699)
In the Dykman case the third person whose statement or confession was sought to be admitted was not present at the trial. In the case sub judice although Adams was physically present he was, for all legal purposes, absent because of his refusal to testify. (See also Walden v. State, Fla.App. 3rd 1973, 284 So.2d 440)
Although the rule here announced may appear at first blush to be harsh it is, like the hearsay rule itself, the product of common sense. Were admissions of guilt made by a party unavailable at the trial to cross-examination, whether as a result of absence or refusal to testify, held to be admissible in evidence at the trial of an accused then a veritable daisy chain of extra judicial "confessions" would be the inevitable result. The case sub judice is an excellent example. Had the alleged statements of Adams, while he refused to take the stand as a witness and testify, been admitted into evidence and believed by the jury then appellants would have been acquitted, never again subject to jeopardy. Then upon Adams being tried for the crimes for which appellants would have been acquitted their confessions would have been admissible in the Adams' trial; resulting, if believed by the jury, in acquittal. Under such circumstances, which are the logical result and not strained fantasy, three persons would be acquitted of the crimes notwithstanding that each voluntarily confessed thereto. What, one asks rhetorically, happens to the public and the victims of crimes under such circumstances? Such cannot be the law of this State.
Finally, we turn to appellants' last point. Prior to trial a motion to suppress the defendants' statements and confessions theretofore made was granted as to statements made to the police, but the motion was denied as to statements made by defendants in open court. Appellants now contend that since the initial statements *487 and confessions were found to have been unconstitutionally obtained, the subsequent statements (which are in actuality confessions) made in open court were inadmissible as fruit of the poison tree. The in-court statements were made by appellants during a "mercy trial" following their conviction based upon their initial guilty pleas. At the time those statements were made there was no issue of guilt to be resolved. The statements were made voluntarily by the appellants in open court with the presence and guidance of counsel during open judicial proceedings under oath, before a trial judge. The statements were not as a result of negotiations, but were made voluntarily for the sole purpose of presenting an impassioned plea of mercy. The statements were properly admitted. (Not controlling, but somewhat similar is Williams v. State, Fla.App. 3rd 1972, 261 So.2d 855. See also Pinkney v. State, Fla.App. 1st 1975, 306 So.2d 155.
We have examined the other points raised by appellants and find them to be without merit. We have also carefully searched the lengthy record of this case seeking to ferret out any points not raised by appellants in their briefs and find none. As above indicated, neither do we find that the record lends merit to those points which are raised in appellants' briefs.
We do not intend the foregoing statements to be construed as criticism of appellants' counsel. On the contrary, our examination of the record and appellants' briefs leads us to the inescapable conclusion that appellants' counsel have ably represented their clients and have made the most advantageous use possible of the evidence and proceedings revealed by the record. We are fully cognizant that the attorneys do not create the facts and the evidence, they only seek to mold it into a supportive foundation for the points which they urge. When the factual foundation is absent, the attorneys can only do the best they can with that which is available. Sub judice appellants' counsel have been admirably resourceful but the record simply does not support their contentions.
Finding that appellants have failed to demonstrate reversible error, the judgment and sentence appealed are
Affirmed.
JOHNSON, Acting C.J., and McCORD, J., concur.
NOTES
[1] Gavin v. State, Fla.App.3rd 1972, 259 So.2d 544, cert. den. 265 So.2d 370.